UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

        Gary L. Pansier and               Case No. 18-22297-beh
        Joan R. Pansier,

                Debtors.           Chapter 7

Patrick S. Layng,

                Plaintiff,

v.                              Adversary No. 18-2222

Gary L. Pansier and
Joan R. Pansier,

                Defendants.

## DECISION ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Starting several decades before they filed their third joint bankruptcy case, the debtors sought out ways to protect their assets. Over the years, but particularly since their last bankruptcy case, they have established a head-spinning sequence of trusts and an LLC into which they transferred their home, personal property, and monthly income.

Among the problems with this strategy were that the debtors continued living in the home, exercising control over the trust property and income as if they were the beneficiaries, or as if there were no trusts (of whatever stripe) in place. Another problem is that the debtors did not list their interests in each of these trusts and the LLC (and the related bank accounts) on their bankruptcy schedules. Those revelations came to light only months later, on the eve of their Rule 2004 examinations, and then after further document discovery.

Mr. Pansier is a retired airline pilot, with a bachelor's degree. Mrs. Pansier is a retired airline attendant and has an executive law degree. They are not unsophisticated, and they are experienced litigants.[1]

The United States Trustee filed an adversary complaint seeking denial of the debtors' discharges based on concealment of assets, failure to maintain adequate books and records, false oaths, and failure to explain a loss or diminution of assets.[2] The U.S. Trustee has moved for summary judgment on all four causes of action asserted in the complaint, which the debtors oppose. Based on a review of the entire docket, the briefing and oral argument, the Court concludes that there are no genuine issues of material fact as to two of the causes of action asserted. Accordingly, the Court grants summary judgment to the United States Trustee on Count I (section 727(a)(2), concealment of assets) and Count III (section 727(a)(4)(A), false oath) of the complaint. The Court denies summary judgment as to Counts II and IV of the complaint.

## JURISDICTION

The Court has jurisdiction under 28 U.S.C. § 1334 and the Eastern District of Wisconsin's July 16, 1984, order of reference entered under 28 U.S.C. § 157(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(J). This decision constitutes the Court's findings of fact and conclusions of law under Fed. R. Bankr. P. 7052.

---

[1] The debtors have represented themselves *pro se* in more than a dozen cases over the last 20 years. *See, e.g.,* Bankruptcy Case No.98-bk-27488-rae (Bankr. E.D. Wis. July 24, 1998) and associated Adversary Nos. 98-ap-2487 (Nov. 6, 1998) and 99-ap-2202 (May 18, 1999); petitions for writ of habeas corpus filed as 06-cv-553 (E.D. Wis. May 16, 2006) and 07-cv-185 (E.D. Wis. April 17, 2007)*;* Bankruptcy Adversary No. 09-ap-2235 (Bankr. E.D. Wis July 15, 2009), appealed by the Pansiers as 10-cv-550 (E.D. Wis. Oct. 14, 2010), and appealed again as 10-3663 (7th Cir. Nov. 16, 2010), as well as associated Adversary No. 09-ap-2450 (Nov. 20, 2009), appealed by the Pansiers as 10-cv-1011 (E.D. Wis. Nov. 12, 2010), and appealed again as 11-2192 (7th Cir. May 25, 2011)*;* Civil Case No. 13-cv-183, *Pansier v. U.S.A. et al.* (E.D. Wis. Feb. 21, 2013)*;* U.S. Tax Court Case No. 003143-13 L, appealed by the Pansiers as 15-1386 (7th Cir. Feb. 27, 2015)*;* current Bankruptcy Case No. 18-bk-22297-beh (Bankr. E.D. Wis. March 19, 2018) and associated Adversary No. 18-ap-2129 (June 11, 2018), as well as related appeals 19-cv-537 (E.D. Wis. April 12, 2019) and 19-cv-1431 (E.D. Wis. Sept. 30, 2019).

[2] See 11 U.S.C. §§ 727(a)(2), (3), (4)(A), and (5).

## UNDISPUTED FACTS

According to the exhibits of record and the parties' briefing and oral argument, the following facts are either undisputed, or not subject to genuine dispute.

### A.    Schedules, statements and testimony

1.  The debtors filed for relief under Chapter 7 of the United States Bankruptcy Code on March 19, 2018 (the "Petition Date").  Case No. 18-22297-beh, ECF Doc. No. 1.

2.  This is the debtors' third joint bankruptcy case since 1998.  *See* Case Nos. 98-27488-rae (Chapter 13 Case, dismissed); 08-32400-svk (Chapter 7 case, discharged).  Defendant Gary Pansier also filed a chapter 7 petition for relief in 1990.  *See* Case No. 90-20906-jes.

3.  Mr. Pansier is a retired airline pilot who holds a bachelor's degree. (UST Ex. 3,[3] Rule 2004 Examination Transcript, at 12:21-24; 14:15-22).

4.  Mrs. Pansier, a retired airline flight attendant, obtained a law degree from Concord Law School in 2009, but has never obtained a law license.  (UST Ex. 3, at 10:16-12:9, 15:3-6; UST Ex. 5, Answer, at ¶ 64).

5.  The debtors reside at N6755 Loop Lake Road, Crivitz, Wisconsin 54114 (the "Crivitz Property").  (UST Ex. 1, at 2; UST Ex. 3, at 7:6-19; UST Ex. 3, at 120:1-4).

6.  The debtors signed the schedules and statements under penalty of perjury, declaring that the information disclosed in them was true and correct.  (UST Ex. 1, Docket Nos. 1, 8, 10, 21, 43; UST Ex. 2, 11 U.S.C. § 341 Meeting of Creditors May 10, 2018 Transcript, at 5:16-23; UST Ex. 5, at ¶ 14).

7.  The debtors testified under oath at their May 10, 2018 11 U.S.C. § 341 meeting of creditors that they listed all of their assets within their bankruptcy schedules.  (UST Ex. 2, at 4:14-22).

8.  In schedule A/B, the debtors disclosed that they:

    (a)  own a 1991 Buick Park Avenue with a value of $250 and lease a Chevrolet Equinox with a value of $32,570; own $1,000 in

---

[3] References to "UST Ex. __" signify the exhibits filed in support of the U.S. Trustee's Statement of Uncontroverted Material Facts, filed on the docket in this adversary proceeding as attachments to ECF Doc. No. 57.

household goods consisting of major appliances, furniture, linens, china, crystal, and kitchenware; own $800 in electronics, consisting of televisions, stereo, computers, printers, cell phones, and camera; own $500 in sports equipment, including bicycles, golf clubs, skis, paddle boat, and a piano; and own $500 in personal jewelry.

(b)   do not own any real property.

(c)   do not have any cash on hand as of the petition date.

(d)   do not have any bank accounts or deposits of money as of the petition date.

(e)   do not have any negotiable instruments including money orders.

(f)   do not have an interest in any incorporated or unincorporated businesses, including an interest in an LLC.

(g)   do not have an interest in any trust, equitable or future interest in property, and rights or powers exercisable for their benefit.

(UST Ex. 1, at 14-23; 73-84).

9.   In total, the debtors disclosed $27,036.45 in personal property.  (*Id.* at 23, 83).

10.   On June 20, 2018, the United States Trustee filed a Fed. R. Bankr. P. 2004 motion seeking documents regarding FLY SLOW F.O., CT, CL and the Sheffield Crest Trust.  (Case No. 18-22297, ECF Doc. No. 29, *see also* ECF Doc. Nos. 48, 44, and 54).

11.   On July 26, 2018, the debtors amended their schedule A/B.  (UST Ex. 1, at 73-84).

12.   In amended schedule A/B question 25, the debtors did not check either box to provide a "yes" or "no" answer to whether they have an interest in any "[t]rusts, equitable or future interests in property . . . and rights or powers exercisable for your benefit."  (UST Ex. 1, at 79-80, 84; UST Ex. 5, at ¶ 27).

13.   In the blank box of amended schedule A/B question 25, the debtors entered "FLY SLOW F.O., a Living Trust Checking Account for Social Security deposits, withdrawn the same month. See Attachment," with a $0 value.  (UST Ex. 1, at 79-80, 84).

14.   On the referenced attachment, the debtors stated: "Sheffield Crest Trust, Tuscany Trail Trust – no equitable or future interests in property. No rights or powers exercisable for our personal benefit.

Therefore, the trusts do not constitute a financial asset." (*Id.* at 80, 84).

15. On Schedule I, the debtors disclose that they are not employed. (UST Ex. 1, at 34).

16. The debtors disclose total monthly income of $7,391.15 from social security income and pension or retirement income. (UST Ex. 1, at 34-35).

17. The debtors disclose total monthly expenses of $5,082.82, including: (a) $1,275 home rental payment; (b) $449.15 vehicle lease payment; (c) $254 telecommunication expense; and (d) $677 food and housekeeping supplies. (*Id.* at 36-38).

18. After expenses, the debtors report $2,308.33 in net monthly income. (*Id.* at 38).

19. On schedule G, the debtors disclose their vehicle lease with GM Financial Leasing. (*Id.* at 32).

20. The debtors do not disclose any residential rental agreement on schedule G. (*Id.* at 32).

21. The debtors filed an amended statement of financial affairs ("SOFA") on May 3, 2018 as Docket No. 21. (*Id.* at 58-70).

22. The debtors do not disclose any rental income on SOFA item 5. (*Id.* at 59).

23. The debtors disclose on SOFA item 18 that they did not sell trade or transfer any property to anyone, other than property transferred in the ordinary course of the debtors' business or financial affairs, within two years of their petition date. (*Id.* at 66).

24. The debtors disclose on SOFA item 19 that they did not transfer any property to a self-settled trust or similar device of which they are a beneficiary (often called asset-protection devices) within 10 years before the petition date. (*Id.* at 67).

25. On SOFA item 27, the debtors disclose that they did not own a business or have any of four specified connections to a business, including as a member of a limited liability company (LLC), within four years before filing bankruptcy. (*Id.* at 69-70).

**B. The Sheffield Crest Trust**

26. In September 1985, Mrs. Pansier, as creator and trustor, executed a declaration of trust to form the Sheffield Crest Trust. (UST Ex. 4, at 83-91).

27. The trustees of the trust were Gary J. Simon and Sandford G. Knapp. (*Id.*).

28. Soon after forming the trust, Mrs. Pansier conveyed the Crivitz Property, which previously was titled in her name, to the Sheffield Crest Trust. (*Id.* at 18, 83-91).

29. According to the trust documents, as consideration for this conveyance of real property, the trust was "empowered to issue to Joan Pansier a total of 200 Units of Beneficial Interest." Those Units of Beneficial Interest were then to be issued to named beneficiaries Alan Edwin Bader and Donna Claire Pansier (100 Units each). (UST Ex. 4, at 85).

30. According to the debtors, the Sheffield Crest Trust "was not organized under state law. . . . [T]he Trust is an irrevocable contractual trust agreement . . . ." (UST Ex. 10, at 5, Interrogatory no. 5).

31. The Crivitz Property has a 2016 tax-assessed value of $343,500 and is not encumbered by a mortgage lien. (UST Ex. 12, at 142; UST Ex. 3, at 69:19-25)

32. The debtors, along with Mr. Pansier's sister, Donna Pansier, reside on the Crivitz Property, although Donna Pansier resides in a separate house on the property. (UST Ex. 3, at 145:1-146:5).

33. The debtors and Donna Pansier entered into a property rental agreement with the Sheffield Crest Trust on January 1, 2003. (UST Ex. 4, at 92-96).

34. The 2003 rental agreement requires the debtors and Donna Pansier to pay the Sheffield Crest Trust a total of $1,275 in monthly rent, or $15,300 annually. (*Id.*).

35. Donna Pansier makes a contribution to the rent via cash payments to the debtors twice a year, which amounts to an annual payment of roughly $1,500. (*See* UST Ex. 3, at 147-49). At the Rule 2004 examination, the following exchange concerning these payments ensued:

> UST's attorney: And does [Donna Pansier] make a contribution towards rent on the property?

| | |
|---|---|
| Mrs. Pansier: | Yes. |
| Mr. Pansier: | Barely. |
| UST's attorney: | What does she pay, Mr. Pansier? |
| Mr. Pansier: | Well, she's living on Social Security, so we're helping her out. |
| UST's attorney: | Okay. You're helping her out? |
| Mr. Pansier: | Yeah. By not charging her hardly any rent. |

. . .

| | |
|---|---|
| UST's attorney: | How much in financial support do you provide to her, Mr. Pansier? |
| Mr. Pansier: | Well, she pays about $115.00 a month. |
| UST's attorney: | And where does she—how does she pay that money, to whom? . . . [D]oes she pay in cash or a check, or what's the method of her paying? |
| Mrs. Pansier: | She just brings me the money. |
| UST's attorney: | Cash? |
| Mrs. Pansier: | Um-hmm. |
| UST's attorney: | And Mrs. Pansier, what do you do with that money? |
| Mrs. Pansier: | Use it for personal expenses, living expenses. |

. . .

| | |
|---|---|
| Mr. Pansier: | Property taxes. We use for the property—we split the property taxes. |
| UST's attorney: | But I thought that property tax was the trust's responsibility? |
| Mr. Pansier: | Yeah. |
| UST's attorney: | So, why would you be using money that's paid to you for trust expenses? |
| Mr. Pansier: | Well, we got to charge her something. |

. . .

| | |
|---|---|
| UST's attorney: | And she pays you every month $115.00, Mr. Pansier? |
| Mrs. Pansier: | Um-um. . . . Twice a year. |
| UST's attorney: | Does she pay you a lump sum? |
| Mr. Pansier: | Twice a year. $700.00. |
| Mrs. Pansier: | Well, roughly $750.00. |

. . .

| | |
|---|---|
| UST's attorney: | So that totals about $1,500.00? |
| Mr. Pansier: | Yes. |
| UST's attorney: | Okay. And did you disclose that in your schedules? |

| Mrs. Pansier: | No. . . . Goes—it's part of the rental agreement to go to the trust. |
|---|---|
| UST's attorney: | Okay. But the money comes to you, Mrs. Pansier, directly; it's not a check written to the trust, right? |
| Mrs. Pansier: | She doesn't write a check. No. Not in a check. |

(UST Ex. 3, at 147-49).

36. The rental agreement provides that the debtors shall have use of all structures, equipment and facilities of the Crivitz Property, and that they agree to accept responsibility for lawn maintenance and snow removal. (UST Ex. 4. at 93).

37. The Sheffield Crest Trust does not hold a bank account (UST Ex. 3, at 80:24), collects rental payments in cash (UST Ex. 3, at 78:2-3; UST Ex. 12, at 173-198), keeps rent proceeds at the Crivitz Property (UST Ex. 3, at 137:22-25; 138:1-23), and pays expenses via cash or money order (UST Ex. 12, at pg. 14-15, Interrogatory No. 17; UST Ex. 12, at 140–60, 209–36).

38. In January, February, March, and April of 2018, Mrs. Pansier collected the rent on behalf of the Sheffield Crest Trust and prepared corresponding rental receipts issued to herself, which indicate that Joan Pansier paid the trust $1,275 in cash each month. (UST Ex. 3, at 137:1-138:11; UST Ex. 4, at 141-142; *see also* ECF Doc. No. 71, audio recording at 1:16:33–1:17:15).

39. The debtors also provided largely identical rental receipts to the United States Trustee for the period of January 1, 2012 through July 1, 2019. (UST Ex. 12, at 173-198).

40. In response to the U.S. Trustee's interrogatories asking the debtors to identify (1) the procedure by which the Sheffield Crest Trust trustee collects and accounts for rent payments from its tenants and (2) all individuals who have collected rent on behalf of the Sheffield Crest Trust from January 1, 2017 to March 1, 2019, the debtors refused to provide a narrative answer and instead referred the U.S. Trustee to excerpts from the Rule 2004 examination transcript, in which the debtors testified to the following:

   (a) The debtors make monthly rental payments of $1,275 to the trust, in cash, before[4] the first of the month.

---

[4] Somewhat in conflict with this testimony, all rental receipts provided to the U.S. Trustee are dated the *first* of each month.

(b)  The money paid to the trust "stays in reserve in the trust," on the Crivitz Property, "in the file."

(c)  Gary Simon is the trustee of the trust, but for a period of time in 2018, Mrs. Pansier had to "do more of the bookkeeping" because Mr. Simon had operations to treat throat cancer.

(d)  Mrs. Pansier prepared at least the January 1, 2018 rental receipt on behalf of the Sheffield Crest Trust (and also paid the rent for that month) because, during that time, the trustee was "out of commission."

(UST Ex 12, at 10-11, Interrogatory Nos. 12-13).

41.  The debtors provided a ledger of expenses paid by the Sheffield Crest Trust from January 2012 through December 2018.  (UST Ex. 12, at 209–36).

42.  In response to the U.S. Trustee's interrogatory asking the debtors to state the exact dollar amount of cash or cash equivalents held by or on behalf of the Sheffield Crest Trust as of March 19, 2018, the debtors did not provide a narrative answer but instead directed the U.S. Trustee to refer to the March 2018 ledger for the Sheffield Crest Trust. (Ex 12 at 13-14, Interrogatory No. 15).

43.  From at least January 2018 to April 2018, Mrs. Pansier paid the expenses on behalf of the trust (UST Ex. 3, at 139:2-9), asserting that she did so only as the temporary, interim trustee. (ECF Doc. No. 64, at 15, 17; ECF Doc. No. 71, audio recording at 1:16:33–1:17:15).

44.  The expenses paid by the Sheffield Crest Trust from the rent collected include the debtors' personal expenses.  For example:

(a)  From 2012 through 2018, the Sheffield Crest Trust paid the debtors' Wisconsin Public Service electric bill, their CenturyLink bill, snow removal costs, and machinery fuel costs.  (UST Ex. 12, at 209–36).

(b)  In July 2017, the Sheffield Crest Trust paid for a $688 washing machine.  (*Id.* at 214).

(c)  In November 2012, the trust paid for a $420 laptop computer from Best Buy.  (*Id.* at 236).

(d)  In July 2012, the trust paid $450 for a recliner.  (*Id.* at 234).

(e) In August and September 2012, the trust paid $411.81 ($210.93 and $200.88) for two dehumidifiers. (*Id.* at 235).[5]

(f) In October 2014, the Sheffield Crest Trust bought "Sevastopol" [sic] geese from Renee Baltz for $120 (*Id.* at 227), and paid for geese feed (corn and sunflower seeds from Crivitz Feed Mill) at an average cost of approximately $35 per month from 2014 through 2018 (*e.g.*, *id.* at 209–28). The debtors list a goose on their schedule of assets as a non-farm animal. (UST Ex. 1, at 17).

45. The trust ledger, maintained on a cash basis, is unclear and does not match all supporting expense receipts. (UST Ex. 12, at 12-15, Interrogatory nos. 14, 17). For example:

(a) A receipt dated October 1, 2015 from Crivitz Lumber Company indicates the Sheffield Crest Trust paid $2,015 in cash. (UST Ex. 12, at 149). But the corresponding ledger for October 2015 does not include any expenses paid to Crivitz Lumber Company. (*Id.* at 223).

(b) There are numerous mathematical errors throughout the document. For example, the January 2012 total expenses are reported as $1,216.56. (*Id.* at 233). The correct sum of the expenses listed is $1,206.69.

(c) There are instances of dates that do not exist throughout the document. For example, the ledger reports making a payment to Maple Valley Insurance on February 30, 2012. There were not 30 days in February 2012. (*Id.* at 233).

(d) There are multiple instances where the ledger is inconsistent with the supporting documents provided by the debtors. For example, the debtors provided an October 24, 2015, invoice from Spectrum that indicates $340 was paid for services. This expense is not recorded in the 2015 ledger for any month. (*Id.* at 146; *compare id.* at 221–24).

---

[5] Notably, the evidence shows overlapping reporting of expenses and assets between the Sheffield Crest Trust and another trust controlled by the debtors, the Fly Slow Trust, discussed *infra*. The Fly Slow Trust claimed to own these two dehumidifiers (as well as other property purchased with funds from the Sheffield Crest Trust). The Fly Slow Trust filed a business property depreciation report with its 2013 federal tax return claiming that an office dehumidifier that cost $211 was placed into service on 8/10/2012, UST Ex. 12, at 109, and that a filing cabinet that cost $295 was put into service on 8/31/2012. *Id.*; compare UST Ex. 12, at 235 (listing a $295 expense for a filing cabinet on October 10, 2012). In addition, the Fly Slow Trust reported depreciation on a tractor and mower put into service on 8/3/13 that cost $1,6888 (UST Ex. 12, at 110); the Sheffield Crest Trust ledger reflects the purchase of a Cub Cadet (mower) for $1,688 on 8/13/2013 (*id.* at 231).

(e) It is unclear what the "Total Balance" referenced throughout the ledger represents. For example, the balance from 2012 – 2014 is reported as $5,771.67 and the year-end balance is reported as negative $6,259.52 leaving a negative balance of $497.95. (*Id.* at 224). If the trust is operating with cash and money orders, it cannot spend more than it has on hand. It is unclear what the cash on hand as of January 1, 2012 was and, therefore, what the cash on hand as of December 31, 2018 was.

46. The Sheffield Crest Trust has not reported its $15,300 in annual rental income to the IRS or Wisconsin Department of Revenue from 2008-2018. (UST Ex. 12, at 4-5, Interrogatory No. 4). Instead, the Sheffield Crest Trust rental income appears to be reported on federal and state tax returns for the Fly Slow F.O. Trust, discussed *infra*, from 2013 through 2015. (UST Ex. 12, at 97, 56, 243).

47. The debtors' personal federal and state tax returns for 2016, 2017 and 2018 neither report rental income nor claim a credit for rent paid on the Crivitz Property (on their state returns). (UST Ex. 12, at 60-77, 78-89; UST Ex. 4, at 3-11).

48. In 2016, the debtors claimed a personal tax credit for payment of $4,571 in property taxes. (UST Ex. 4, at 3-11).[6]

## C.    The STS Program

49. In 2012, on the advice of their financial planner(s), the debtors implemented a "specialized trust strategy." This strategy involved the following three steps:

> (1) An individual/investor creates a trust (Trust 1) and transfers his/her assets into Trust 1;

> (2) Trust 1 then creates an LLC, into which it transfers the assets; and

---

[6] The debtors claim that this was done in error, asserting in their response to the U.S. Trustee's statement of facts (*see* ECF Doc. No. 64): "The Defendants contacted their accountant, James Berdan, of the Optima Group, LTD., [who] sent a letter to Laura D. Steele, Office of the United States Attorney, on September 11, 2019. Mr. Berdan explained that 'the property taxes on their 2016 Wisconsin return were paid by the property owner Sheffield Crest Trust. I did therefore, claim those property taxes in error on their 2016 return.'" The debtors did not, however, support this assertion with any admissible evidence. Notably, the record in the debtors' main bankruptcy case reflects that the debtors also claimed a deduction for their residence's real property taxes on their 2014 federal income tax return, *see* Case No. 18-22297, ECF Doc. No. 67-2, at 3. The debtors claimed that this was a mistake by their accountant, and that no other federal tax returns reflect this deduction, *see* Case No. 18-22297, ECF Doc. No. 72 at 17-18.

(3) The LLC then creates a second trust (Trust 2) "[t]o protect the assets owned by the LLC," and transfers only the equity of the assets into Trust 2. Trust 2, in turn, files a UCC-1 lien on the LLC to protect the equity it owns in the assets of the LLC:



(UST Ex. 12, at 138). Under this specialized trust strategy, the debtors sought to ". . . Give up Ownership . . . retain Control . . . ." (*Id*.).

50. Pursuant to this strategy, in February 2012, the debtors transferred their legal and equitable interests in their personal assets to three separate trusts (the Fly Slow F.O. Trust, the Fly Slow F.O. Living Trust, and the Tuscany Trail Trust) and a limited liability company (Casey's Shadow, LLC). (UST Ex. 3, at 33:1–6, 43:22–44:10, 46:7–12, 47:12–18, 96:5–22, 111:1–113:1, 114:19–25, 115–121, 125:2–16, 151:8–22, 154:9–23; UST Ex 4, at 21–48, 55, 74, 81–82, 109, 116, 136; UST Ex. 12, at 121–125, 138).

51. Also pursuant to this strategy, in April 2012, the equity in the Crivitz Property (which the debtors previously transferred to the Sheffield Crest Trust) was purportedly transferred to the Fly Slow F.O. Trust. (UST Ex. 4, at 151).

**D.    The Fly Slow F.O. CT, CL Trust**

52. On February 26, 2012, the debtors executed a "contract and declaration of trust" designated as FLY SLOW F.O., CT, CL. (UST Ex. 4, at 20-81). (The debtors explained that "CT" stands for contract trust, and "CL" stands for common law. *See* UST Ex. 3 at 109:15–110:25.)

53. The Fly Slow F.O. "Contract and Declaration of Trust" describes the entity as a "pure contract trust" (UST Ex. 4, at 21), which the debtors claim "was not organized under state law." (UST Ex. 12, at 6, Interrogatory no. 6).

54. The debtors received $10 and 100 trust certificate units as consideration for the transfer of certain property to Fly Slow F.O., CT, CL. (UST Ex. 4, at 21, 38-48).

55. As of the Petition Date, the debtors were trustees of Fly Slow F.O., CT, CL. (UST Ex. 5, at 26, ¶ 91).

56. According to the documents of record, the debtors also are the current beneficiaries of the Fly Slow F.O., CT, CL. Although Mrs. Pansier testified at the Rule 2004 examination that the beneficiaries of the trust are Mrs. Pansier's sisters (*see* UST Ex 3, at 119:4-24), the documents to which she referred during that testimony (UST Ex. 4, at 49, 51-53) indicate otherwise: the contract itself states that the Fly Slow F.O., CT, CL was "created for the benefit of the Certificate Holders" (UST Ex. 4, at 21); the current certificate holders, according to the trust documents, are Mr. and Mrs. Pansier (UST Ex. 4, at 49). Mrs. Pansier's sisters will become certificate holders *only* upon the death of Mr. or Mrs. Pansier (UST Ex. 4, at 51-52). Further, the Pansiers, as certificate holders, "have the right to change, amend, alter, or rescind" the future gift of trust certificates to Mrs. Pansier's sisters "at any time." (*Id.*).

57. The Schedule of Fly Slow F.O., CT, CL assets (dated February 26, 2012) includes: (a) Gary Pansier's airline pension from Prudential Insurance Company; (b) Gary Pansier's Social Security Administration Account; (c) Joan Pansier's Northwest Airlines pension; (d) Joan Pansier's Social Security Administration Account; and (e) the Fly Slow Living Trust BMO Harris Bank checking account. (UST Ex. 4, at 81).

58. According to Fly Slow F.O., CT, CL schedule B-1, the Sheffield Crest Trust transferred the equity in the Crivitz Property to Fly Slow F.O., CT, CL in April 2012. (UST Ex. 4, at 151; UST Ex. 3, at 207:17-25; 208-211).

59. The debtors provided a copy of schedule B-1 to the Internal Revenue Service on November 6, 2017, explaining: "We are also providing documents relating to the fact that the equity in the Sheffield Crest Trust was transferred to Fly Slow F.O., CT, CL on February 12, 2012." (UST Ex. 13, at 3, 6; UST Ex. 3, at 207:17-25; 208-211).

60. In their answer to the U.S. Trustee's complaint, the debtors stated the facts somewhat differently: ". . . Schedule B-1 to the trust states that the Sheffield Crest trust by Trustee Gary J. Simon transferred the equity in the Crivitz Property to the Fly Slow trust as of April 2012; however, this was an inadvertent error due the fact that Sheffield Crest Trust is an irrevocable trust and the FLY SLOW F.O., CT, CL MINUTE ORDER NO. 10 shows that the original Schedule B-1 was rescinded on May 29, 2012." (UST Ex. 5, at 27, ¶ 93).

61. The United States Trustee requested copies of all books, records, and minutes of Fly Slow F.O., CT, CL from January 1, 2012 to April 1, 2012, including a copy of Minute Order No. 10. (ECF Doc. No. 47, Document Request No. 14.) In response, the debtors produced "FLY SLOW F.O., CT, CL Contract and Declaration of Trust MINUTE NO. 10 CHANGE OF ADDRESS: LIMITED LIABILITY COMPANY" dated February 26, 2012, which changed the address of Casey's Shadow LLC to the address of the Crivitz Property, but does not negate the equity transfer. (UST Ex. 12, at 200).

62. In their brief in opposition to the U.S. Trustee's motion for summary judgment, the debtors provided a slightly different explanation concerning the rescission of the equity transfer than the one provided in their answer to the complaint:

> The Defendants admit to the confusion surrounding the fact that they made representations to the IRS in 2017 that in 2012 the equity was transferred to the FLY SLOW TRUST, F.O. CT, CL. This was the procedure in the financial planning program, Master's Protection Group, LLC (STS) the Defendants joined in 2012 in order to add an additional layer of protection in the case of an unexpected automobile accident, identity theft, death/probate, or nursing home spend down. After Michael Clark, the Representative Financial Planner passed away on June 18, 2017 and William F. Tully of Tully Tax and Accounting took over, the Defendants were advised to rescind the original Fly Slow, F.O. CT, CL Schedule B-1: Real Property Equity Transfer which they did on December 16, 2017 because the legal title to the property and the warrant deed were in the name of Sheffield Crest Trust.

(ECF Doc. No. 63, at 28). In support of this new explanation, the debtors produced, for the first time, a copy of "Fly Slow F.O. CT, CL Minute No. 13," which indicates that a meeting was held on December

16, 2017, at which Schedule B-1 was rescinded, and is signed by both Gary and Joan Pansier in their capacity as trustees. (ECF Doc. No 63, at 46-47). The debtors offered no explanation for why this record was not produced pursuant to the U.S. Trustee's discovery requests, nor did they explain why this new document conflicts with the representation in their answer—that the transfer was rescinded in May 2012.

63.  Schedule B-2 to the Fly Slow F.O., CT CL trust documents details the tangible personal property transferred to that trust on April 19, 2012, to include "home furnishings, lawn and garden equipment, antiques, photographic/audio/video equipment, precious metals, jewelry, furs, collectibles, etc." Schedule B-3 details the transfer of equity in the debtors' 1991 Buick Park Avenue to the trust. (UST Ex. 4, at 39-40).

64.  Schedule B-4 to the Fly Slow F.O., CT CL trust documents represents that on April 19, 2012, the debtors transferred investment equity in their Metlife IRA Account *117 and their Fidelity Investment Stock Account *202 to that trust. (UST Ex. 4, at 41).

65.  The debtors use the assets transferred to the Fly Slow F.O., CT CL for their personal benefit. For example, during the Rule 2004 examination, Mrs. Pansier testified that in December 2017 she took a $3,971 withdrawal from Fidelity Account *202 in order to pay personal expenses. (UST Ex. 3, at 97:1-98:19).

66.  During that same examination, Mrs. Pansier did not mention obtaining authorization from the trustees of the trust before making the withdrawal. When asked what steps she had to take to be able to make a withdrawal from the Fidelity investment account on December 13, 2017, Mrs. Pansier replied: "I just had to contact the Fidelity investments." (*Id.*). The debtors for the first time on August 2, 2019, produced a general minute order of Fly Slow F.O., CT CL approving the Fidelity distribution in the amount of $3,967. The document states that a special meeting was held on December 10, 2017, and is stamped with the signatures of both Gary and Joan Pansier in their capacity as trustees. (UST Ex. 12, at 44).[7]

---

[7] As noted further below (see Fact No. 102), the Fidelity Account *202 purportedly was transferred to the Tuscany Trail Trust in 2012, and therefore the Fidelity Account is *not* listed in the schedule of assets for the Fly Slow F.O. Trust, but is instead listed as an asset of the Tuscany Trail Trust. (*See* UST Ex. 4, at 81, 116). The debtors did not explain why the authorization for use of the Fidelity funds was given by the Fly Slow Trust, rather than the Tuscany Trail Trust.

67.  Schedule B-6 to the Fly Slow F.O., CT CL trust documents represents that on March 26, 2012, the debtors transferred all of their income regardless of source to Fly Slow F.O., CT, CL.  (UST Ex. 4, at 43-48).

68.  The debtors use this income to pay their personal expenses, including their credit cards.  (UST Ex. 3, at 123:21-124:3, 126:17-25, 127:1-3; UST Ex. 6, at 76-81; UST Ex. 7, at 4; UST Ex. 8 at 9).

69.  The United States Trustee requested and the Court ordered the debtors to produce copies of tax returns for Fly Slow F.O., CT, CL from 2012 through 2018.  (ECF Doc. No. 47; UST Ex. 11, at 10, Document request 10).

70.  The debtors replied that federal and state tax returns were prepared for "Fly Slow Trust" from 2012, 2013, 2014 and 2015.  (UST Ex. 12, at 22-23, Interrogatory no. 10).

71.  The U.S. Trustee asserts that the debtors produced no Fly Slow Trust tax returns for 2012, a federal but not a state return for 2013, a state and an incomplete federal return for 2014, and a state but not a federal return for 2015, citing to UST Ex. 12, at 45-59, 90-119, 237-244.  The debtors dispute this description of their partial production of tax returns, stating:

> The Plaintiff claims that fifty (50) pages of federal and state returns were provided when the actual number is ninety (95) pages consisting of federal and state returns for 2012, 2013, 2014 and 2015.  Perhaps, if the Plaintiff cannot maintain proper custody of the documents provided by the Defendants, then they should not be requesting a thousand-plus documents.  . . . If the Plaintiff agrees to reimburse the Defendants for copying costs, they would be willing to provide the returns for them a second time.

ECF Doc. No. 64, at 26.  The debtors did not provide the Court, or support their response, with copies of the alleged "missing" tax returns they claim to have provided to the U.S. Trustee.

72.  The Fly Slow F.O. Trust's 2013 IRS form 1041 discloses operation of the Crivitz Property as a rental property on schedule E, receipt of $15,306 in rental receipts (UST Ex. 12, at 97), and includes a depreciation schedule for the Crivitz Property.  (*Id.* at 97; 90-119).

73.  The Fly Slow F.O. Trust's 2014 IRS form 1041 discloses negative rents of $13,036, and fails to include schedule E.  (*Id.* at 45-59).  On its 2014

Wisconsin Form 2, the trust discloses $16,581 in other income. (*Id.* at 56).

74. The Fly Slow F.O. Trust's 2015 Wisconsin Form 2 discloses rental income of $15,300 from the Crivitz Property. (*Id.* at 242-43).

**E.    The Fly Slow F.O. Living Trust**

75. On February 26, 2012, the debtors were involved in the creation of another trust, the Fly Slow F.O. Living Trust, and were appointed as its trustees. (UST Ex. 12, at 121-125).

76. The debtors were trustees of Fly Slow F.O. Living Trust as of the petition date. (*Id.* at 125).

77. Fly Slow F.O. Living Trust holds a checking account at BMO Harris Bank *590 ("BMO Account"). (UST Ex. 6, at 51).

78. The debtors opened the BMO Account in or about April 2012 using tax EIN ending 7368. (*Id.*)

79. As of the Petition Date, the BMO Account was open and held a balance of $2,447.68. (*Id.* at 81). The debtors did not disclose either the account or the funds held in the account on their bankruptcy schedules. (UST Ex. 1).

80. The debtors represent that the Fly Slow Living Trust held only "residuary assets" as of the Petition Date. (UST Ex. 12, at 20, Document Request No. 4A).

81. When asked in an interrogatory to identify all restrictions placed upon the defendants' use of social security income or pension income deposited into the bank account held in the name of the Fly Slow F.O. Living Trust, the debtors stated that, as trustees of Fly Slow F.O. Living Trust, they "have full authority to purchase sell or retain any Trust investments" and "[t]he only restriction place[d] on the Trustees is not to engage in bad faith or fraudulent conduct." (UST Ex. 12, at 9-10, Interrogatory no. 10A).

82. The debtors pay their personal credit card bills and propane gas expenses from the Fly Slow F.O. Living Trust BMO Account. (*See e.g.*, UST Ex. 6, at 76-81, and 120; UST Ex. 7, at 4; UST Ex. 8, at 9; UST Ex. 12, at 33-34).

83. The debtors also withdraw cash for their personal use from the Fly Slow F.O. Living Trust BMO Account. (UST Ex. 3, at 131-132:1-22). For example, between January 2018 and the end of March 2018, Mrs.

Pansier withdrew $8,400 in cash from the account: $4,000 on January 8, $1,000 on January 23, $500 on January 26, $200 on February 26, and $2,700 on March 2. (UST Ex. 6, at 77-81, 115-117). The debtors did not disclose any cash on hand within their schedules. (UST Ex. 1). The debtors were not able to explain the disposition of the $2,700 in cash withdrawn on March 2, 2018, when asked at their Rule 2004 examination.[8] (UST Ex. 3, at 130:18- 25; 131:1-16).

84. The debtors did not disclose (1) the Fly Slow F.O., CT, CL, (2) the Fly Slow F.O. Living Trust, or (3) the Fly Slow BMO Account used for their personal expenses, until questioned by the United States Trustee.[9] (UST Ex. 1).

85. The debtors did not disclose the 2012 prepetition transfer of assets to Fly Slow F.O., CT, CL or Fly Slow F.O. Living Trust until questioned by the United States Trustee. (UST Ex. 1; *see also* UST Ex. 4 at 139-40).

---

[8] Instead, the debtors attempted to explain the use of this cash in their response to the U.S. Trustee's statement of facts as follows:

> The Defendants' monthly expenses from January, 2018 to March, 2018 according to their Schedules is $5,082.82, including the $2,000 paid for the Seventh Circuit Court of Appeals assessment, the $385.00 paid for the bankruptcy filing, and the $500.75 paid to Scioli & Associates, totaling $18,134.21. Because the IRS was seizing 100% of Mr. Pansier's pension income, the Defendants['] total income from January, 2018 through March, 2018 was $13,149.75. [FN 8] It is evident that the Defendants were insolvent and could not provide for their necessary living expenses while the IRS was levying over half their monthly income, and were left with no other option than to file bankruptcy.

> [FN 8] This amount includes the $3,000 withdrawal amount from the Defendant's Fidelity Investment Account in February, 2018.

ECF Doc. No. 64, at 30.

[9] Although the defendants claim that this fact is controverted, they do not explain the basis of their dispute. Instead, they concede that they did not disclose the existence of the trusts at issue until after the U.S. Trustee began raising questions about their assets: "On May 29, 2018, the Defendants received a letter inquiring as to where the Defendant's social security deposits were made. As an act of good faith and full disclosure, the Defendants amended their Schedule A/B to show the existence of the Trusts, even though they have no equitable or legal title to any real property, and provided the Plaintiff with a copy." *See also* UST Ex. 4, at 139-40 (the Pansiers' June 14 response letter). The debtors raised similar, unsupported disputes regarding their disclosure of the other STS entities and corresponding transfers, which likewise do not create genuine disputes of material fact. *See In re Pansier*, 451 Fed. Appx. 593, 596 (7th Cir. 2011) (explaining, where debtors only intimated that IRS employees who discussed entries on transcript of account were not credible, that "insinuations of dishonesty cannot establish a triable issue.").

## F.    Casey's Shadow, LLC

86.  On February 26, 2012, the debtors, in their capacity as trustees of the Fly Slow F.O., CT, CL, created a single-member limited liability company, Casey's Shadow LLC.  (UST Ex. 4 at 117-137; *id.* at 55 (Fly Slow Minute No. 9)).

87.  Casey's Shadow LLC received an Indiana certificate of organization on February 27, 2012 from the Indiana Secretary of State.  (*Id.* at 124-25).

88.  Fly Slow F.O., CT, CL is the single member of Casey's Shadow LLC.

89.  The debtors are the managers of Casey's Shadow LLC.  (*Id.* at 127, 137).

90.  Fly Slow F.O., CT CL Minute No. 9 dated February 26, 2012, states that the debtors, in their capacity as Fly Slow trust trustees, caused assets listed on schedules B-1 through B-5 of the Fly Slow F.O., CT, CL trust documents to be transferred to Casey's Shadow LLC.  (*Id.* at 55).

91.  In a letter dated November 6, 2017, the debtors disclosed to the Internal Revenue Service that Casey's Shadow LLC "holds the asset consisting of real property located at [the Crivitz Property]."  (UST Ex. 13, at 3, 26).

92.  The debtors represent that Casey's Shadow LLC is a holding entity and that "the assets of Casey's Shadow LLC as of March 19, 2018 consist of the assets in the Fly Slow Trust, F.O. CT CL."  (UST Ex. 12, at 20-21, Document Request no. 6).

93.  On April 24, 2012, the debtors, as managers of Casey's Shadow LLC, opened BMO Harris Bank account *698 in the name of Casey's Shadow LLC (the "Second BMO Account").  (UST Ex. 6, at 8).  The debtors are signatories to the Second BMO Account.  The Second BMO Account was open on the debtors' petition date.  (*Id.* at 8, 30).

94.  Income from Mrs. Pansier's work as an election inspector for the Town of Stephenson is directly deposited into this account.  (UST Ex. 3, at 158:1-23; UST Ex. 6, at 33).

95.  Mrs. Pansier withdraws cash from this account for personal expenses.  (UST Ex. 3, at 158:1-23; UST Ex. 6, at 45).

96.  The debtors did not disclose Casey's Shadow LLC, the prepetition transfer of personal and real property to the LLC, or the Second BMO Account until questioned by the United States Trustee.  (UST Ex. 1*; see also* UST Ex. 4, at 139-40).

### G. The Tuscany Trail CT, CL Trust

97. On February 28, 2012, Mrs. Pansier, as manager of Casey's Shadow LLC, entered into a contract and declaration of trust for Tuscany Trail CT, CL. (UST Ex. 4, at 97-116).

98. The Tuscany Trail "Contract and Declaration of Trust" describes the entity as a "pure contract trust" (UST Ex. 4, at 98), which the debtors assert "was not organized under state law." (UST Ex. 12, at 7, Interrogatory no. 7).

99. As of the petition date, the debtors were trustees of Tuscany Trail CT, CL. (UST Ex. 4, at 112).

100. According to the documents of record, the debtors also are, indirectly, the current beneficiaries of the Tuscany Trail Trust. The Tuscany Trail Trust was purportedly "created for the benefit of the Certificate Holders" (UST Ex. 4, at 98); the current certificate holder, according to the trust documents, is Casey's Shadow, LLC (UST Ex. 4, at 115). The Pansiers are the managers of this LLC, and its sole member is the Fly Slow F.O., CT, CL (of which the Pansiers are both trustees and beneficiaries, as previously noted).

101. The Tuscany Trail, CT, CL trust documents disclose that Casey's Shadow LLC, by its manager, Mrs. Pansier, and for consideration of $10 and 100 Trust Certificates, transferred certain real and/or personal property to the Tuscany Trail Trust. (*Id.* at 98).

102. The Schedule of Tuscany Trail, CT, CL assets (dated February 26, 2012) includes: (1) Metlife account *117; (2) Fidelity Account *202; (3) all tangible personal property of the debtors; and (4) all wages paid to Mrs. Pansier from the Town of Stephenson, Marinette County for Election Inspector duties. (*Id.* at 116).

103. The debtors did not disclose the Tuscany Trail Trust until questioned by the U.S. Trustee. (UST Ex. 1; *see also* UST Ex. 4, at 139-40).

104. On August 25, 2017, the debtors caused a UCC financing statement to be filed with the Wisconsin Department of Financial Institutions as file

no. ending *6823.  The debtors listed Tuscany Trail as the secured party.  The financing statement covers the following collateral:

> All present and future equity in the real property at: N6755 Loop Lake Road, Crivitz, Wisconsin 54114. Legal Description: 39.10 AC SE NE S31 T32N R20E EX Loop Lake Road RD 81.D506. All personal property owned by the above named Debtors, including, but not limited to: bank checking and savings accounts; vehicle equity; home furnishings; audio/video equipment; tools; lawn and garden equipment; antiques; collectibles; artwork; jewelry; investments including stocks, bonds, retirement pensions, mutual funds, previous metals, etc.; business interests, licenses, patents and inheritances. etc.

(UST Ex. 9).[10]

105. According to the debtors, "The UCC-1 formerly [sic] announces (justifies) the Trust's security interest in future earnings and the Defendant's [sic] former assets until the Certificates of Beneficial Interest are fully paid up by the Contractors.  This security interest includes present future acquired income including all income, inheritances, windfalls, lottery winnings, life insurance pay-outs, etc., now and in the future, from any and all sources."  (UST Ex. 12, at 29, Document Request no. 20).

106. The debtors did not disclose the Tuscany Trail trust's security interest in their assets within their schedules or statements.  (UST Ex. 1, at 26, and generally).

## H.    Litigation Involving the Internal Revenue Service

107. After receiving a discharge in their prior bankruptcy case, Case No. 08-32400-svk, the debtors filed an adversary proceeding seeking a declaration that their federal income tax liability for 1995 through 2006[11] was included in the discharge, Adv. No. 09-02450-svk.

108. In that adversary proceeding, the bankruptcy court ultimately granted summary judgment in favor of the IRS, concluding that the debtors' federal income tax liability for 1995 through 2006 was not discharged in the 2008 bankruptcy.

---

[10]  The debtors claim that this fact is controverted, but do not explain the basis of their dispute.  Instead, they simply refer to a prior financing statement that they caused to be filed with the Wisconsin Department of Financial Institutions: "This statement is controverted by the Defendants.  The UCC financing statement was originally filed listing Tuscany Trail as the secured party as directed by their financial planner UCC-1 Original Filing on May 2, 2012, *7734.  This document has been part of a public record since 2012, and is easily obtained by filing a party search."  The debtors do not provide a copy of this 2012 financing statement to the Court in support of their response.  In any event, their response—which does not refute the debtors' filing of the 2017 UCC financing statement—does not create a genuine dispute of material fact.

[11]  As of the filing of the debtors' current bankruptcy case, the debtors' liability for those tax years, according to the IRS's December 6, 2018 proof of claim, was over $250,000.

109. The debtors appealed that decision to the U.S. district court. On April 11, 2011, the district court issued a decision affirming the ruling of the bankruptcy court. *See Pansier v. United States*, No. 10-CV-1011, 2011 WL 1598970 (E.D. Wis. Apr. 27, 2011).

110. The debtors then appealed that ruling to the Seventh Circuit. On December 19, 2011, the Seventh Circuit issued a decision also affirming the ruling of the bankruptcy court. *See In re Pansier*, 451 Fed. Appx. 593 (7th Cir. 2011).

111. In December 2017, the United States Internal Revenue Service filed a civil complaint in the District Court for the Eastern District of Wisconsin, seeking to reduce to judgment unpaid federal tax assessments made against the debtors for tax years 1995 through 2006 and 2014, *See* Case No. 17-cv-01740.

112. In response to that complaint, on March 9, 2018, the debtors filed an "Affidavit of Fact." (UST Ex. 13, at 5-28) In that Affidavit, the debtors relayed to the district court the following correspondence history with the IRS:

    (a) On July 19, 2017, the debtors received correspondence from IRS Revenue Officer Benson, informing them that, "according to [IRS] records, it appears you have property in the name of Sheffield Crest Trust" and requesting documents pertaining to the Sheffield Crest Trust. (*Id.* at 19).

    (b) The debtors responded to Revenue Officer Benson via letter on August 4, 2017, asserting that the doctrines of *res judicata* and collateral estoppel precluded the IRS from revisiting or re-litigating the issue of whether or not the Pansiers have a beneficial interest in the Sheffield Crest Trust. (*Id.* at 20).

    (c) On September 18, 2017, Revenue Officer Benson mailed a Summons to the debtors, ordering them to appear on October 9, 2017 and produce for examination "[a]ny and all documents relating to Sheffield Crest Trust." (*Id.* at 22).

    (d) On October 1, 2017, the debtors sent a letter to Revenue Officer Benson informing him that the issue of whether or not they have a beneficial interest in any real property was previously determined in their prior bankruptcies in 1990, 1998, and 2008. (*Id.* at 23).

    (e) On October 4, 2017, the debtors received a letter from Revenue Officer Benson informing them that by producing "documents related to the Trust, including any court documents which preclude the IRS from revisiting or re-litigating the trust issue, you

can establish that the Trust is not a fiduciary or transferee." (*Id.* at 26).

(f) On November 1, 2017, Revenue Officer Benson filed a Notice of Federal Tax Lien naming Sheffield Crest Trust as Nominee of Joan R Pansier. (*Id.* at 1, 23).

(g) On November 6, 2017, the debtors sent a letter to Revenue Officer Benson (*see id.* at 1-4) providing him with copies of the schedules from their 1990, 1998, and 2008 bankruptcies, as well as "Schedule B-1, Real Property Equity Transfer, Certificate of Organization for the Limited Liability Company, Casey's Shadow, Bank Resolution and Minutes, Notices in Affidavit Form, and a Freedom of Information (Privacy Act) Request and Response dated September 5, 2017." The debtors informed the district court: "All the documents establish that Sheffield Crest Trust is not a 'fiduciary or transferee' as stipulated by RO Benson." (*Id.* at 26).

113. In the "Affidavit of Fact," the debtors also requested the following costs and damages: (1) Research - $3,000.00.00; (2) Document Preparation - $2,300.00; Damages - Compensatory, Pecuniary, Punitive (Involuntary Servitude, Wrongful Levy, Loss of Consortium) - $895,000.00. (*Id.* at 28).

114. The district court litigation was stayed by the filing of this bankruptcy case.

## ANALYSIS

The U.S. Trustee has moved for summary judgment on his objections to the debtors' discharges under 11 U.S.C. §§ 727(a)(2), (3), (4)(A), and (5). Denial of discharge is a harsh sanction, and courts construe discharge exceptions strictly in favor of the debtor. *In re Kontrick*, 295 F.3d 724, 736 (7th Cir. 2002), *aff'd,* 540 U.S. 443 (2004).

Summary judgment is appropriate if the pleadings and affidavits on file show there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (incorporated by Fed. R. Bankr. P. 7056). The moving party bears the burden of establishing that there is no genuine issue about any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmoving party then must present significant probative evidence in support of its opposition to the motion for summary judgment in

order to defeat the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).

At the summary judgment stage, the Court's role is *not* to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial—"whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. A factual dispute is "genuine" only if there is sufficient evidence for a reasonable fact-finder to find in favor of the nonmoving party. *Id.* at 249. For a fact to be material, it must be "outcome-determinative under governing law." *Contreras v. City of Chicago*, 119 F.3d 1286, 1291–92 (7th Cir. 1997). In determining whether there is a genuine issue of material fact, the Court must view the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *E.E.O.C. v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000).

## A.      Section 727(a)(2): Concealment of Assets

The U.S. Trustee's first cause of action for denial of discharge is based on 11 U.S.C. § 727(a)(2). Section 727(a)(2) provides that a court shall grant a discharge unless:

> the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate . . . has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
>
> > (A) property of the debtor, within one year before the date of the filing of the petition; or
> >
> > (B) property of the estate, after the date of the filing of the petition.

11 U.S.C. § 727(a)(2).

To prevail on a claim under § 727(a)(2)(A), the U.S. Trustee must prove the following elements: (1) the debtors transferred, removed, destroyed, mutilated, or concealed property; (2) belonging to the debtors; (3) within one

year of filing the petition; (4) with the intent to hinder, delay, or defraud a creditor of the estate. *Kellogg–Citizens Nat'l Bank of Green Bay v. DeBruin (In re DeBruin)*, 144 B.R. 90, 92 (Bankr. E.D. Wis. 1992); *see also Kontrick,* 295 F.3d at 736. An objection to discharge under § 727(a)(2)(A) "consists of two components: an act (i.e., a transfer or a concealment of property) and an improper intent (i.e., a subjective intent to hinder, delay, or defraud a creditor)." *Kontrick,* 295 F.3d at 736 (internal quotation marks omitted). A debtor's honest confusion or lack of understanding may weigh against a finding of fraudulent intent. *Hatton v. Spencer (In re Hatton)*, 204 B.R. 477, 484 (E.D. Va. 1997).

"The elements under § 727(a)(2)(B) are 'substantially the same' as those under § 727(a)(2)(A). Unlike § 727(a)(2)(A), however, which relates to a debtor's actions in the year prior to the petition date, § 727(a)(2)(B) addresses a debtor's actions *after* the filing of the petition." *Grochocinski v. Campbell (In re Campbell)*, 475 B.R. 622, 636 (Bankr. N.D. Ill. 2012) (internal citations omitted). Section 727(a)(2)(B) concerns a transfer or concealment of property of the *estate*, rather than property of the debtor.

### 1. Concealment of Property

For purposes of section 727(a)(2), concealment consists of "failing or refusing to divulge information to which creditors were entitled." *Jeffrey M. Goldberg & Assocs., Ltd. v. Holstein (In re Holstein)*, 299 B.R. 211, 228–29 (Bankr. N.D. Ill. 2003) (internal quotation marks omitted); *see also Peterson v. Scott (In re Scott)*, 172 F.3d 959, 967 (7th Cir. 1999) (concealment includes "preventing discovery," or "fraudulently transferring or withholding knowledge or information required by law to be made known") (internal quotation marks omitted). A concealment "will be found when a debtor purports to transfer an asset, making it appear to the world that he no longer owns it, but in fact retains an interest in the asset." *In re Holstein*, 299 B.R. at 229. In addition*,* "[e]ven when the debtor does transfer an asset, there may be a concealment if he continues to use the asset as his own." *Id.* (citing *Friedell v. Kauffman (In re*

*Kauffman),* 675 F.2d 127, 128 (7th Cir. 1981) (per curiam) (holding that "transfer of title with attendant circumstances indicating that the bankrupt continues to use the property as his own is sufficient to constitute a concealment").

Under the "continuing concealment" doctrine, which has been adopted by the Seventh Circuit, a concealment that falls within the scope of section 727(a)(2)(A) may be found "where a debtor has transferred property more than one year before the bankruptcy filing but has retained a secret interest in the property that has continued into the 12–month immediate-pre-bankruptcy period," and has done so with the requisite intent. *McNichols v. Shala (In re Shala)*, 251 B.R. 710, 714 (N.D. Ill. 2000). "In cases in which the creditor can establish that the debtor retained either control or an equitable interest in the property, courts have denied discharge under the doctrine of continuing concealment." *Clean Cut Tree Serv., Inc. v. Costello (In re Costello),* 299 B.R. 882, 895 (Bankr. N.D. Ill. 2003).

The U.S. Trustee alleges that the Pansiers violated section 727(a)(2) by concealing their interests in at least four separate trusts and a limited liability company containing assets in which they have a beneficial interest, both before and after filing their petition. Specifically, the debtors failed to disclose, in their schedules and at their meeting of creditors, their interest in the STS entities (the two Fly Slow trusts, the Tuscany Trail trust, and Casey's Shadow, LLC) and in the real property and rent proceeds held by the Sheffield Crest Trust.

Turning first to the STS entities, the Pansiers assert that they have no beneficial interests in these entities because they are not beneficiaries of the trusts or members of the LLC. The Pansiers are incorrect. The record establishes that the Pansiers are direct beneficiaries ("certificate holders") of the Fly Slow, F.O. CT, CL, and indirect beneficiaries of the Tuscany Trail Trust. As both trustees and beneficiaries of these trusts, the Pansiers maintained and exercised complete control over the trust assets, both before and after filing for

bankruptcy.[12]  According to the Pansiers' testimony, they treat the bank accounts of the Fly Slow Living Trust and Casey's Shadow, LLC, as their own piggy banks, withdrawing money from the accounts to pay their personal expenses.  Tellingly, the Pansiers also listed the assets supposedly held by the STS entities (*e.g.*, their household furnishings, a 1991 Buick Park Avenue, Fidelity Investment Account and MetLife IRA) as their *own* assets on their bankruptcy schedules.  And the debtors use these assets for their personal benefit, too; for example, in December 2017 the Pansiers withdrew $3,971 from the Fidelity Account to pay personal expenses.

The undisputed material facts establish that the Pansiers exercised complete control over the STS entities and treated the assets of those entities as their own, both before and after filing their bankruptcy petition.  The Pansiers failed to disclose their beneficial interest in these entities when they filed this case, and continued to conceal those interests when they amended Schedule A/B specifically to *disclaim* any legal or equitable interests in trusts, equitable or future interests in property, and rights or powers exercisable for their benefit.  As a matter of law, the debtors' failure to disclose their interests in the STS entities is a "concealment" within the meaning of section 727(a)(2).

The same can be said for the Pansiers' concealment of their beneficial interest in the property held by the Sheffield Crest Trust.  Although the Pansiers assert that they gave up all ownership interests in the Crivitz Property in 1985 (and therefore they cannot be liable for a "transfer" or "concealment" of any interests in this property within the relevant time period), the undisputed facts establish that the debtors retained a secret beneficial interest in the

---

[12] The Pansiers assert in their response brief that they are no longer trustees of the Fly Slow Trust, as of November 16, 2018.  This unsworn statement is not supported by any documentary evidence showing the appointment of a new trustee.  The Pansiers had the opportunity to provide such documentation to the Court in support of their brief, but chose not to do so.  In any event, their fresh assertion does not change the Court's analysis; the appointment of a new trustee does not negate the fact that the Pansiers concealed an interest in the Fly Slow Trust both before and after they filed their bankruptcy petition and schedules in March 2018.

Crivitz Property after the 1985 transfer, and up through the filing of their petition.

Transfer of legal title to property outside the one-year lookback period does not immunize a debtor from liability under section 727(a)(2). For example, in *Kauffman*, the debtor was found to have retained—and concealed—a beneficial interest in real property (a house) that he transferred to his wife prepetition, because he continued to live in the house and to make mortgage, tax, and insurance escrow payments, took out several personal loans using the house as collateral, and listed the property as one of his assets on personal financial statements. 675 F.2d at 128. Likewise, in *Rhode Island Depositors Econ. Prot. Corp. v. Hayes (In re Hayes),* 229 B.R. 253, 260 (1st Cir. BAP 1999), the debtors were found to have retained a secret interest in property (their residence), which they transferred to a trust for the benefit of their children and purported to rent under a "sham" lease, while continuing to enjoy free use of the residence, paying mortgage, real estate taxes, and utility charges on the property, borrowing funds secured by the property, and representing themselves as owners of the property. The Bankruptcy Appellate Panel noted:

> transfer of legal title to the trust for no consideration while continuing the status quo in all other respects . . . presents a classic example of desperate debtors' attempts to have their cake and eat it too, while denying any piece to pressing creditors. It is decorated with all the marks of the fraudulent retention of a secret property interest.

*Id. See also Thibodeaux v. Olivier (In re Olivier)*, 819 F.2d 550, 554–55 (5th Cir. 1987) (debtors were found to have retained a beneficial interest in a residence they transferred seven years prior to filing, when they continued to live in the residence rent-free and continued to maintain and insure the property); *Keeney v. Smith (In re Keeney),* 227 F .3d 679, 683–84 (6th Cir. 2000) ("A beneficial interest of ownership in the property can be inferred . . . from [the debtor's] payment for and use of the properties, including his rent-free residence on each and payment of all mortgage obligations."); *cf. Smith v. Taylor (In re Taylor)*, 424 B.R. 438, 444–45 (Bankr. S.D. Ind. 2009) (debtor was found *not* to have retained a beneficial interest in a tavern after transferring legal title to a

corporation owned by her husband, based solely upon fact that, following transfer, she continued to manage the tavern in the same way she had done prior to transfer; there was no evidence that, following transfer, the debtor co-signed a loan for the tavern, pledged it as collateral, derived an income stream therefrom, used it to pay her personal expenses, or took any other actions that would be consistent with incidents of ownership).

A case that bears many similarities to this case is *U.S. v. Hart (In re Hart)*, 563 B.R. 15 (Bankr. D. Idaho 2016). In *Hart*, the debtor transferred his residence to an irrevocable trust for the benefit of his daughter several years before filing his bankruptcy case; he later directed that the property be transferred to another irrevocable trust. The debtor continued to live in the property and paid rent of $600 per month to the (new) trust in cash. He kept the rent in a desk drawer at the residence, and withdrew the money as he needed for expenses related to the house. Although the debtor was not the trustee of the trust, he effectively operated, managed and ran the trust in all material regards. He also "took care of virtually everything involving the Property, including payment of all utilities, repairs, and real estate taxes." 563 B.R. at 26. The bankruptcy court concluded that the debtor maintained a secret and concealed interest in the property, explaining:

> Hart retained virtually all the interests of an owner of the real property, including . . . the uninterrupted possession of and right to live in the Property. Hart dealt with the Property as his own, and without any regard to the burdens associated with a trust as titled owner. It was Hart, not any one of the so-called "trustees," who handled everything involving the Property. Other than the title record, nothing regarding the Property, or Hart's sole and exclusive control and use of the Property, changed after the deeds to the WPV Trust or subsequently the SEH Trust. The putative ownership and control of the Property by these trusts and their titular "trustees" was a sham.

563 B.R. at 47–48.

Like the debtor in *Hart*, the Pansiers have retained virtually all the interests of owners of the real property, including the uninterrupted possession of and right to live in the property. Although the Pansiers pay monthly rent to the trust, the undisputed material facts show that this rental income is used

for purposes other than protecting and preserving the trust assets for the benefit of the beneficiaries. While some of the expenses paid by the trust are related to the preservation of the property, such as the payment of taxes and insurance, many are not. For example, the trust pays the Pansiers' Wisconsin Public Service electric bill and their CenturyLink phone/internet bill. It also pays for snow removal services, despite the rental agreement between the trust and the Pansiers stating that the Pansiers are responsible for snow removal. The trust has purchased furniture and household appliances that do not bear a trust-related purpose, including a recliner and washing machine. The recliner does not bear a trust purpose; in fact, the recliner only bears one of the debtors comfortably on a football Sunday. The trust even bought the Pansiers' geese and pays to feed them. Whether the geese are pets or a source of food for the Pansiers, buying and feeding geese provides no benefit to the trust and its denominated beneficiaries. These fowl only favor the Pansiers personally. In short, rather than allow the trust to amass income that it then can invest or save for distribution to the named trust beneficiaries, the Pansiers deplete the trust's account reserves for their own expenses.

The Pansiers appear to argue that the use of these funds is warranted because "the Trustees [of the Sheffield Crest Trust] are authorized to reside in the trust headquarters and to supply maintenance and other services for the benefit of this trust and to do so on a contract basis." ECF Doc. No. 64, at 17. Whether or not the trust documents permit use of trust funds to pay the Pansiers' personal expenses (such as electricity, internet, a recliner, goose feed) those payments represent a form of income the Pansiers receive from the trust—income the Pansiers were required to disclose. This stream of income and "use of headquarters" constitutes a secret beneficial interest in the trust property, one that the debtors continue to disclaim.

What is more, despite their assertion that the Sheffield Crest Trust is irrevocable, in 2012, the Pansiers directed its trustee to transfer the equity in the Crivitz Property to the STS entities, on the advice of their financial planner—apparently to enable one of the STS trusts to file a UCC lien against

the equity in the Crivitz Property, among other things. This transfer cannot be viewed to be in the best interest of the beneficiaries of the Sheffield Crest Trust. The only parties to benefit from this transaction were the Pansiers. Although this transfer ultimately was rescinded as being prohibited by the underlying trust documents, the material fact remains that, from 2012 through December 2017, the equity in the Crivitz Property purportedly was held by one or more of the STS entities, which, as previously established, the Pansiers controlled.[13] The Fly Slow Trust, not the Sheffield Crest Trust, reported rental income and/or depreciation on the Crivitz Property in its 2013, 2014, and 2015 tax returns (Fly Slow didn't file returns after 2015). The Fly Slow Trust also reported depreciation on *other* property it claimed to own, but that was purchased with funds from the Sheffield Crest Trust: a dehumidifier, a filing cabinet, and a tractor and mower—further evidence that the Pansiers exercised control over the assets of the Sheffield Crest Trust by transferring them to the STS entities.

The Pansiers argue that they have never used the Crivitz Property as collateral for a loan or held the property or insurance in their names since 1985—some of the hallmarks of retaining a secret beneficial interest in property. But the debtors' ability to orchestrate and direct the transfer of property from the Sheffield Crest Trust to the STS entities in 2012 and afterward belies their assertion that they are mere tenants and contractors of the trust (subject to eviction at will), with no ability to control or use the Crivitz Property or other trust assets as their own.

In sum, although the Pansiers disclaim any beneficial interest in the Crivitz Property, the uncontroverted facts establish otherwise. The Court therefore concludes as a matter of law that the Pansiers retained a secret beneficial interest in the Crivitz Property and Sheffield Crest Trust assets

---

[13] The record contains conflicting information about *which* of the STS entities owned the equity in the property during this time. The trust documents in evidence show that the Sheffield Crest Trust transferred the equity in the property to the Fly Slow, F.O. CT, CL; the Pansiers told the IRS in late 2017 that Casey's Shadow, LLC held the property; and the UCC lien against the property was filed by the Tuscany Trail Trust.

during the one-year period before their bankruptcy filing, and after.  The question remains whether the debtors concealed these interests, as well as their beneficial interests in the STS entities, with the requisite intent to hinder, delay, or defraud creditors during the relevant time period.

## 2. Fraudulent Intent

Actual intent to hinder, delay, or defraud rarely is proven by direct evidence; instead, it is established most often by circumstantial evidence, or inferred from the debtor's course of conduct.  *In re DeBruin*, 144 B.R. at 93 (debtors used help of a layperson to set up trusts in effort to prevent bank from liquidating its collateral); *In re Costello*, 299 B.R. at 900.  Factors that indicate an intent to hinder, delay, or defraud include the following:

1. Lack or inadequacy of consideration for the property transferred;
2. Existence of a family relationship between the transferor and transferee;
3. The transferor's retention of possession, control, benefits or use of the property;
4. The financial condition of the transferor both before and after the transfer occurred;
5. Existence or cumulative effect of a pattern or series of transactions or course of conduct at the onset of financial difficulties, or pendency or threat of suits by creditors; and
6. The general chronology and the timing of the transfers in question.

*In re DeBruin*, 144 B.R. at 93.  *See also In re Olivier*, 819 F.2d at 554–55 (debtors transferred ownership of their home to mother-in-law upon realization that a personal injury suit and adverse judgment against one of the debtors were likely, repaid mother-in-law within days of transfer and continued to enjoy benefits of home ownership).

Many of these badges of fraud identified in *DeBruin* are present here.  First, the transfers lacked adequate consideration.  In 1985, Joan Pansier transferred the Crivitz Property to the Sheffield Crest Trust for "200 Units of Beneficial Interest," which she promptly gifted to relatives.  In 2012, the Pansiers transferred their personal property, including all future income in any

form from any source, to the Fly Slow F.O., CT, CL for $10 and 100 trust certificate units. According to the terms of the trust documents and the Pansiers' testimony, these trust certificates grant the bearer no legally recognized interests or rights—only a possible future distribution from the net income of these trusts (which the Pansiers claim are not income-producing), distributed at the sole discretion of the trustee. Second, as the Court previously has concluded, the Pansiers maintained possession, control, and the benefit and use of the transferred property, and used the rent proceeds and income from the trusts to pay their personal living expenses. Third, the 2012 transfer of property to the STS entities—including the transfer of the equity in the Crivitz Property—occurred approximately two months after the Seventh Circuit affirmed the decision of the bankruptcy court in the debtors' 2008 case holding that their significant federal income tax liability for 1995 through 2006 was not discharged in that bankruptcy.

The Pansiers' continued use of the property as their own, coupled with their continued denial of any ownership interest—including in a November 6, 2017, letter to the IRS in which the Pansiers assert that Casey's Shadow LLC "holds the asset consisting of real property located at [the Crivitz Property]"— support the conclusion that the Pansiers concealed their interests in the trusts and trust properties with the intention of concealing their property from their largest creditor, the IRS. In addition, the Pansiers were aware of the nominee liens the IRS filed against the Sheffield Crest Trust in 2017, and knew that the legitimacy of the trust—and thus their ownership of the Crivitz Property—was in dispute. Despite this knowledge, they failed to disclose the existence of the trust or their interest in the real property on their bankruptcy schedules. Taken together, the circumstances lead to only one reasonable conclusion: that the debtors concealed their property interests with the requisite intent.

Responding, the Pansiers make a number of arguments, none of which negate the Court's finding of fraudulent intent. The Pansiers first direct the Court to their prior bankruptcy cases, asserting that they disclosed no interest in any real property in those cases, and that the U.S. Trustee did not object to

their discharges then.  The debtors' argument leaves out a critical distinction between this case and their last: they created the STS entities and transferred their assets to those entities—including the equity in the Crivitz Property—*after* their prior case, in 2012.  The Pansiers may have received and heeded bad advice from their financial planners in implementing the STS strategy,[14] but those choices do not absolve them of the obligation to disclose the trusts they created and the transfers they made in reliance on that advice.

The debtors also assert that, having no training in bankruptcy law, they used their previous schedules prepared by counsel in 2008 as "guidelines" for this bankruptcy filing.  *See Hunter v. Sowers (In re Sowers)*, 229 B.R. 151, 157 (Bankr. N.D. Ohio 1998) ("[E]vidence tending to show that a debtor was merely ignorant in his actions will tend to negate the actual intent to defraud as long as the debtor did not act in a manner constituting a reckless indifference to the truth.").  But the debtors' reliance on 2008 documents is not reasonable.  First, they have been actively involved after 2008 in the transfer of significant assets to various trusts, namely, in 2012.  Nor can a reliance on documents prepared in 2008 negate a finding of intent to defraud in 2018 based on the totality of the circumstances.  For example, despite using the Fly Slow BMO Account, on which they are signatories, on a regular basis—withdrawing $2,700 from that account approximately two weeks before filing their 2018 bankruptcy—the Pansiers inexplicably failed to disclose any interests in deposits of money (or cash on hand) on their schedules.  *See, e.g., Sowers*, 229 B.R. at 157 (it would be "preposterous" to view the debtors' omissions as "merely the result of some sort of oversight or ignorance on the part of the [debtors]" given the debtors' multiple material omissions).  At a minimum, the myriad omissions in the

---

[14]  The STS strategy the Pansiers adopted, to create what they and their advisors characterize as "pure contract trusts" may be somewhat akin to asset protection means others have tried, to bad end.  *See, e.g., U.S. v. Stephenson*, 313 F. Supp. 2d 1054, 1058 (W.D. Wash. 2004) (describing defendants' advice to their customers on the use of "pure contract trusts", instructing them to transfer personal assets into four different trusts, each intended to perform a unique function within the scheme, with the ultimate goal of evading taxes on income and wages and hiding assets from IRS collection efforts).

debtors' bankruptcy petition and schedules demonstrate a reckless indifference to the truth. *See id.*

The Pansiers also make the incorrect legal assertion that their affidavits, in which they state that they do not have a beneficial interest in property and did not transfer or conceal any property with the intent to hinder, delay, or defraud creditors, must be accepted as true, and are sufficient to preclude summary judgment, citing to inapposite case law concerning the standards under Federal Rule 9 and motions for preliminary injunctions, *e.g.*, *Group v. Finletter,* 108 F. Supp. 327 (D.D.C. 1952). But the Court is not required to accept the debtors' self-serving conclusory affidavits in the face of contradictory and irrefutable evidence. *See Chapman v. Charles Schwab & Co. et al. (In re Chapman)*, 265 B.R. 796, 812 (Bankr. N.D. Ill. 2001) ("Self-serving statements which are conclusory statements of law or fact are not permissible under Rule 7056(e)."); *see also Campana v. Pilavis (In re Pilavis)*, 244 B.R. 173, 176 (B.A.P. 1st Cir. 2000) ("Pilavis cannot manufacture a disputed issue of material fact by contradicting his own prior sworn testimony.") (citing *Colantuoni v. Alfred Calcagni & Sons, Inc.,* 44 F.3d 1, 4–5 (1st Cir.1994) ("When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed.")).

As a final argument, the Pansiers assert that "[t]he Office of the United States Trustee has no authority or jurisdiction to impair or override the Defendant's inalienable Constitutional rights to create private contracts; rights that are also protected by the 'due process' clause of the Fifth Amendment." But the protections afforded by the U.S. Constitution do not insulate the debtors from their omissions and concealment in this case, nor strip the Court of jurisdiction to decide this dispute. *See, e.g., Cuene v. Peterson (In re Peterson)*, 604 B.R. 751, 765 (Bankr. E.D. Wis. 2019) (describing cases where

debtors failed to schedule transfers of property while continuing to enjoy beneficial use of the transferred assets).

Notwithstanding any legal constructions which favor the debtors, *see Kontrick*, 295 F.3d at 736, given the undisputed facts, the U.S. Trustee has met his burden of proving by a preponderance of the evidence that the debtors concealed property (their interests in at least four separate trusts and a limited liability company containing assets in which they have a beneficial interest), both before and after filing their petition. No reasonable factfinder could conclude that the debtors lacked an intent to defraud in doing so. *See, e.g.*, *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998) (acknowledging that summary judgment on a fraud claim can be appropriate where the explanations sought to be withheld from a factfinder are utterly implausible); *In re Peterson*, 604 B.R. at 765–66 (same). Even though the Pansiers eventually made some amendments to their schedules, the case law cautions that debtors "may not excise a false oath . . . by making subsequent corrections to [their] bankruptcy petition." *Layng v. Sgambati (In re Sgambati)*, 584 B.R. 865, 872 (Bankr. E.D. Wis. 2018). Not all amendments are in vain, per se, but "[a]llowing a debtor to submit false schedules and then, on discovery, avoid the negative consequence of his dishonesty by amending those schedules is contrary to the spirit of the law which aims to relieve honest debtors only. A small number of initial omissions may not warrant denial of discharge, where there is no evidence of intent to defraud, or no pattern of omission." *Id.* (internal citations and quotation marks omitted). But here, the long-standing beneficial interest in and use of trust property despite denial of that interest can only equal a concealment, like a false oath, not curable by later amendment. The U.S. Trustee therefore is entitled to judgment as a matter of law on his cause of action under 11 U.S.C. section 727(a)(2).

Because the U.S. Trustee has prevailed on one of his four causes of action to deny the debtors' discharges, the Court need not consider the remaining three causes of action asserted in the complaint. *See In re Holstein*,

299 B.R. at 226.  For completeness of discussion, however, the Court will address the merits of the U.S. Trustee's request for summary judgment on the remaining three causes of action under section 727(a).

## B.    Section 727(a)(3): Failure to Maintain Adequate Books and Records

Under section 727(a)(3) of the Bankruptcy Code, a court shall grant a discharge unless "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case." 11 U.S.C. § 727(a)(3).

The purpose of § 727(a)(3) is "to make the privilege of discharge dependent on a true presentation of the debtor's financial affairs." *In re Scott*, 172 F.3d at 969 (internal quotation marks omitted).  The Seventh Circuit has summarized:

> Section 727(a)(3) requires as a precondition to discharge that debtors produce records which provide creditors "with enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present."  The provision ensures that trustees and creditors will receive sufficient information to enable them to "trace the debtor's financial history; to ascertain the debtor's financial condition; and to reconstruct the debtor's financial transactions."  Records need not be kept in any special manner, nor is there any rigid standard of perfection in record-keeping mandated by § 727(a)(3).  On the other hand, courts and creditors should not be required to speculate as to the financial history or condition of the debtor, nor should they be compelled to reconstruct the debtor's affairs.

*In re Juzwiak*, 89 F.3d 424, 427–28 (7th Cir. 1996) (internal citations omitted).

The language of section 727(a)(3) "places an affirmative duty on the debtor to create books and records accurately documenting his business affairs." *In re Scott*, 172 F.3d at 969; *see also In re Juzwiak*, 89 F.3d at 429 ("The debtor has the duty to maintain and retain comprehensible records.").  Creditors are not required to accept a debtor's unsubstantiated oral testimony in lieu of concrete written records. *Juzwiak*, 89 F.3d at 429–30.  Nor are creditors "required to risk the withholding or concealment of assets by the

bankrupt under cover of a chaotic or incomplete set of books or records." *In re Scott*, 172 F.3d at 969 (internal quotation marks omitted).

Moreover, intent is not a required element of section 727(a)(3). *Scott*, 172 F.3d at 969; *Juzwiak*, 89 F.3d at 430 ("Although the ultimate goal of § 727(a)(3) is to distinguish between the honest debtor, who should be granted the privilege of discharge, and the abusive or unworthy debtor, who does not deserve such a benefit, creditors do not need to prove that the debtor intended to defraud them in order to demonstrate a § 727(a)(3) violation.") (internal citation omitted). A creditor has the initial burden of proving only that the debtor failed to keep adequate records. *Structured Asset Servs., L.L.C. v. Self (In re Self)*, 325 B.R. 224, 241 (Bankr. N.D. Ill. 2005). "Records are not 'adequate' if they do not provide the trustee or creditors with enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present." *Id.* (internal quotation marks omitted).

The type and quantity of records required to satisfy the debtor's duty under section 727(a)(3) varies, based on the circumstances of the case. "Courts should consider the sophistication of the debtor, his educational background, his business experience and acumen, and his personal financial structure." *In re Self*, 325 B.R. at 241. For example, in *Scott* and *Juzwiak*, the debtors were engaged in significant business transactions involving large sums of money; the Seventh Circuit concluded that those debtors should be held to a higher level of scrutiny than most:

> [M]ost bankruptcies are consumer-type bankruptcies with no assets or business affairs to speak of, and, therefore, the complexity of their business transactions do not implicate § 727(a)(3). But where debtors are sophisticated in business, and carry on a business involving significant assets, creditors have an expectation of greater and better record keeping. As the debtors in this case lost over $20 million, there might be grounds to question their level of sophistication. But as they solicited the investments made, set up the impenetrable financial maze and directly controlled both the flow of funds and the investment

decisions of the business entities, we conclude that they should be held to a higher level of scrutiny than an ordinary debtor.

*In re Scott*, 172 F.3d at 970 (internal citation omitted); *In re Juzwiak*, 89 F.3d at 428 ("We recognize that in some situations (such as where there is no business activity involved or the number of transactions is extremely limited) the type of records submitted by Juzwiak may be sufficient to enable creditors to trace financial transactions and evaluate the debtor's financial condition. The instant case, however, clearly does not involve such a situation. Juzwiak ran a business enterprise engaged in a steady stream of large scale transactions involving substantial sums of money.") (internal citation omitted).[15]

A debtor's involvement in a business (or a trust), however, does not necessarily require the Court to impose the heightened record-keeping standard of *Scott* and *Juwiak*. In *In re Tauber*, the bankruptcy court noted that the standards set forth in *Scott* and *Juzwiak* (1) were "imposed *ex post facto* on debtors whose *business affairs* were the subject of scrutiny in a bankruptcy case," and (2) were "stated with respect to cases **in which the debtor himself/herself/themselves was/were engaged in a *business*,** the operations of which became the focus for matters relating to the assets and liabilities of the debtor in a case." *Buckeye Retirement Props. v. Tauber (In re Tauber)*, 349 B.R. 540, 550 (Bankr. N.D. Ind. 2006) (emphasis in original); *see also id.* at 547 ("If the debtor is a sophisticated business person, and the debtor's bankruptcy case *directly involves the debtor's business in relation to creditors of the debtor,* there is a higher standard.") (emphasis in original). The

---

[15] In *Scott*, the debtors maintained a database to allow them to track the thousands of transactions between their various business entities and third parties, which became unusable before a trustee was appointed. As a result, the trustee was forced to trace thousands of transactions using the 435 boxes of supporting documents the debtors provided, which the court found to be inadequate in the circumstances. And in *Juzwiak*, the court expected the business debtor—who ran a business purchasing, hauling, and reselling grain—to produce more than checking account ledgers, canceled checks, bank statements and an income tax return (all of which failed to (a) reflect the source of the funds deposited into the checking account, how much grain was purchased with the funds at what price, and which business supplied the grain sold; (b) substantiate the debtor's business expenses or detail how much grain the debtor purchased at what price; and (c) document employee payroll deductions or payroll taxes).

*Tauber* court refused to apply the heightened level of scrutiny described by the Seventh Circuit, even though the debtor owned a business, because it was the debtor's *personal*, rather than his *business*, transactions that were at issue in that case:

> It must initially be noted that, although the debtor is a principal and officer in the lender entity, the focus of the record keeping requirement in this case is *not* possible disposition of assets of the lender, but rather [the creditor's] sense that Tauber has squirreled away some of the proceeds of these loans [$35,000 in loans, made by the debtor's company to the debtor] and not disclosed them in his personal Chapter 7 case. Thus, in terms of the stringent record keeping standards noted above, the disposition of the loan proceeds revolves about what Tauber did with the proceeds. In this context, Tauber is more akin to a consumer debtor's case, and the inquiry regarding records focuses not on intricate documentation of business transactions of Tauber, but simply on how did Tauber spend the loan proceeds over the course of time from the date of his receipt of them to the date of his filing his Chapter 7 case. In its proper context, the issue is the extent to which Tauber should have kept detailed records of his *personal* expenditures. In a very real sense, the records requirement with respect to Tauber in relation to his personal expenditures is no different than that which would be imposed on a consumer Chapter 7 debtor to account *by records* for his/her/their expenditure of $35,000 of inheritances, of lottery winnings, of proceeds of a sale of property, of commissions or bonuses—received in the year prior to filing of the bankruptcy case. The focus is on Tauber's personal life—not on documentation of business transactions. As a result, the heightened record keeping requirements imposed upon the debtors in *In re Juzwiak, supra.* and in *Peterson v. Scott, supra.,* do not apply in this case. In that light, the standard to be applied by the Court here must accommodate the myriad of circumstances which arise in Chapter 7 consumer cases in which debtors may be called upon to provide records of their ordinary life's comings and goings and of the expenditures made by them in their pursuit of their lives.

349 B.R. at 553.

After applying the less-stringent standard imposed on the "ordinary" consumer debtor, the bankruptcy court in *Tauber* concluded that the records the debtor maintained were "in consonance with ordinary records kept by ordinary people" and therefore sufficient. *Id.* at 554. *Compare In re Self,* 325 B.R. at 240 (recognizing that while section 727(a)(3) "was not meant to bar the discharge of the ordinary consumer debtor, a 'sudden and large dissipation of assets' [in this case, a million dollars in lottery winnings], coupled with a lack

of books and records will provide a basis for denial of a discharge under this section.") (internal citation omitted).

Once a creditor (or, here, the U.S. Trustee) satisfies its initial burden of proving that the debtor failed to keep adequate records, the burden shifts to the debtor to justify the lack of adequate records. *In re Self*, 325 B.R. at 242. "A bankruptcy judge has broad discretion to decide whether . . . a debtor's failure to keep records is justified." *Hunt v. O'Neal (In re O'Neal)*, 436 B.R. 545, 558 (Bankr. N.D. Ill. 2010). "More often than not, courts that consider this [justification] provision guide their analysis on whether the failure has resulted in an inability to prepare accurate schedules and statement of financial affairs for the debtor, or, in the alternative, whether the failure has made such preparation unduly burdensome on a trustee." *Schaumburg Bank & Trust Co., N.A. v. Hartford (In re Hartford)*, 525 B.R. 895, 911 (Bankr. N.D. Ill. 2015).

The U.S. Trustee alleges that the debtors violated section 727(a)(3) by failing to produce adequate records, without justification, for (1) the Sheffield Crest Trust and (2) the Fly Slow Trust. The Court will address each set of records in turn.

**1. Sheffield Crest Trust documents**

The first basis of the U.S. Trustee's claim under section 727(a)(3) is that the Pansiers failed to produce complete, accurate, and reliable records regarding the Sheffield Crest Trust—"records regarding the Sheffield Crest Trust's collection of the Defendants' rental payments, an explanation of how the trust has applied the payments to expenses, and how much cash or cash equivalents the trust had on hand at the Crivitz Property as of the Petition Date." More specifically, the U.S. Trustee alleges that two sets of documents the debtors *did* produce—an income/expense ledger and rental receipts—are unsubstantiated and unreliable. The income ledger, says the U.S. Trustee, shows "mathematical errors, entries for nonexistent dates, [and] missing

expenses," among other things.[16]  And the rent receipts, per the U.S. Trustee, are unverified and unsupported by any documentary evidence.  For example, the debtors have not provided any money orders indicating payment of rent to the trust, nor do any bank records demonstrate the cash or check withdrawal of the $1,275 monthly rental payment to Sheffield Crest Trust.[17]

The U.S. Trustee further alleges that the debtors have not provided any justification for this failure to maintain adequate records, and therefore have violated section 727(a)(3).  To determine whether that is so, the Court must answer the following questions:

(1) Are the Sheffield Crest Trust records documents "from which the debtor's financial condition or business transactions might be ascertained"?

(2) If so, are the debtors responsible for a failure to keep or preserve adequate records for that trust?

(3) If so, was that failure justified?

Ultimately, there are disputed issues of material fact such that the Court cannot resolve the matter on summary judgment.

### a. Are the Sheffield Crest Trust records documents "from which the debtors' financial condition or business transactions might be ascertained"?

Under section 727(a)(3), a debtor has a duty to maintain only those documents that are necessary to ascertain his or her financial condition or business transactions—in other words, documents that are material to the debtor's financial status and have any bearing on the bankruptcy estate.  The

---

[16] The U.S. Trustee adds: "And while the Defendants assert that Sheffield Crest Trust is not required to file tax returns, the Defendants reported rental income on 2013, 2014 and 2015 tax returns for another entity—Fly Slow F.O. . . . Trust.  The Defendants offer no explanation for why rental income collected by Sheffield Crest Trust would be included on tax returns for another entity. Instead, the conflicting tax returns and myriad errors and omissions within the rent ledger support a finding that it is not reliable."

[17] The U.S. Trustee adds: "The Defendants' personal tax returns also call into question the veracity of the rental receipts provided to the United States Trustee.  For example, the Defendants did not claim a Wisconsin tax credit for rental payments in 2016, 2017 or 2018. Instead, in 2016, the Defendants claimed a Wisconsin tax credit for property taxes paid— indicating ownership rather than rental of a property."  In response, the debtors assert that their accountant, Mr. James Berdan, claimed those property taxes in error on their 2016 return.  *See supra* n.6.

Pansiers suggest that the trust documents do not meet this threshold, asserting in their response brief:

> [T]he Plaintiff failed to show how §727(a)(3) even applies to the records of the Trusts and the LLC in a personal bankruptcy before a discharge could be denied. The Plaintiff had the burden of proof to provide evidence that the Defendants have an equitable or legal interest in the Trusts and the LLC records and are required to keep and retain records pertaining to them. The Plaintiff has . . . failed to meet this burden with a preponderance of evidence. The Plaintiff also failed to show that the 965 pages of documents provided by the Defendants were necessary in order to ascertain the Defendant's personal financial situation, as required.

The U.S. Trustee disagrees. According to the U.S. Trustee, the Pansiers' financial affairs are deeply intertwined with their trusts. Among other things, the Pansiers claim that they pay $1,275 in cash to the Sheffield Crest Trust and that the trust keeps the cash proceeds at their residence, but the Pansiers are unable to provide any reliable records corroborating the cash rent payments and have refused to state how much cash is kept at their residence on behalf of the Sheffield Crest Trust. As a result, says the U.S. Trustee, the records of the Sheffield Crest Trust are relevant and necessary to understanding the debtors' financial affairs. *See Wachovia Bank, N.A. v. Spitko (In re Spitko),* 357 B.R. 272, 308 (Bankr. E.D. Pa. 2006) (although the debtors' corporations were not their alter egos, the financial records of the corporations were nevertheless necessary for the trustee to have accurate information concerning the debtors' assets that might be available for liquidation, because the debtors' income and assets were largely derived from the two corporations).

The success of the U.S. Trustee's argument—in essence, that the debtors in this case should be held to a "higher standard" and required to provide documents relating to their trust, like the business debtors in *Scott, Juzwiak,* and *Spitko*—depends on whether the debtors' income and assets (and thus their overall financial condition) are dependent on the trust. In the *Tauber* case described above, the bankruptcy court declined to apply the more stringent standard set forth in *Scott et al.,* noting that the focus of that case was not on the debtor's interaction with or connection to his business, but on his

disposition of loan proceeds he received from the business.  In that context, the relevant inquiry was whether the debtor adequately documented the expenditures he made in his personal life, and the records the court required the debtor to maintain were "what one would expect a regular person, even one with some business background, to make and keep as the documented record of their lives."  349 B.R. at 553.

In this case, however, the U.S. Trustee's concern about the Sheffield Crest Trust records is not how the Pansiers spent money they received from the trust, but whether and to what extent the Pansiers retained a secret beneficial interest in the trust's assets—such as rent proceeds belonging to the Sheffield Crest Trust, to which the debtors had access and used to pay their personal expenses.  (In other words, the debtors' receipt, rather than their expenditure, of money.)  Because the Court has concluded that the Pansiers *do* maintain a beneficial interest in the assets of the Sheffield Crest Trust, including the rent proceeds, the records of the trust are material to and bear on the financial condition of the debtors themselves.

### b. Are the debtors responsible for a failure to keep or preserve adequate records of the trust?

The Court next must determine whether the records the Pansiers provided were inadequate—and if so, whether the Pansiers should be held responsible for that inadequacy.

The Pansiers assert in their brief:  "It was certainly possible to ascertain the Defendants['] *personal* financial condition and assets from the documents provided."  The Court disagrees. The documents provided raise more questions than they answer.  As previously noted, the income/expense ledger for the Sheffield Crest Trust does not contain a starting balance for January 1, 2012, and therefore it cannot be used to calculate reliably the balance of the account when the debtors filed their petition in March 2018.  The ledger also is inundated with math errors and is inconsistent with supporting receipts.

Moreover, despite the Sheffield Crest Trust purportedly receiving rent of over $15,000 per year from the debtors, the trust did not file tax returns for tax

years 2008 through 2018 (and possibly for prior years), even though Section 6012(a)(4) of the Internal Revenue Code provides: "Returns with respect to income taxes under subtitle A shall be made by the following: . . . Every trust having for the taxable year any taxable income, or having gross income of $600 or over, regardless of the amount of taxable income . . . ."  26 U.S.C. § 6012(a)(4).  Instead, *another* trust—the Fly Slow F.O., CT, CL—reported what should be Sheffield Crest Trust rental income on its federal and state tax returns for at least 2013 through 2015.  (The Fly Slow Trust has not filed any tax returns since 2015.)  The records the debtors provided do not explain this inconsistency—for example, there are no records from the Sheffield Crest Trust showing disbursement or transfer of rental income to the Fly Slow Trust.  Nor do the records resolve the inconsistencies regarding ownership of the equity in the Crivitz Property.  In sum, the available records do not allow the Court to ascertain the debtors' financial condition—which is dependent on income received from the Sheffield Crest Trust—with any certainty, and therefore they are inadequate.

But inadequacy of the records is only half the analysis; responsibility is the other.  The Pansiers assert that they cannot be held responsible for the inadequacy of the Sheffield Crest Trust records because they are not the trustees of the trust, and therefore have no duty to keep the trust's books and records under state law.  Even if the debtors are not required to create and maintain the trust records under state law, they nevertheless may be found to have such a duty under bankruptcy law: "The focus is whether the debtor should be held responsible in light of all the relevant circumstances."  *In re Tauber*, 349 B.R. at 547.  In *In re Hart*, for example, the bankruptcy court concluded that the debtor—even though he was not the trustee of the trust at issue—was required (and failed) to keep and preserve records of that trust:

> Though there were "trustees," Hart's own testimony, in addition to that of the identified "trustees," makes clear that Hart managed all the financial affairs of the trusts. The "trustees" were shown to have been such in name or title only, and they performed no cognizable duties or services

as trustees. Hart—though purportedly as a "manager" of the trust assets rather than as trustee—performed all functions.

*In re Hart*, 563 B.R. at 37.

Here, however, issues of material fact remain as to whether the debtors should be held responsible for the failure to maintain adequate records for the Sheffield Crest Trust. Mrs. Pansier testified that she acted as the trustee for only a short period of time in early 2018. Without any direct evidence to the contrary, the Court cannot conclude as a matter of law that Mr. Simon was a trustee in name only and performed no cognizable duties or services as trustee. While testimony from Mr. Simon or other trustees of the trust may establish otherwise, the record on summary judgment cannot allow the Court to make that finding.

### c. Was any failure to maintain records justified?

Even if the Court were to find the debtors responsible for the inadequacy of the Sheffield Crest Trust records, material issues of fact also remain as to whether such failure was justified. The Pansiers' assertion that they are not trustees of the trust implicitly aims to justify any failure on their part by their reliance on the trustees of the Sheffield Crest Trust to maintain adequate records. The debtor in *In re Hart, supra*, asserted a similar justification; in the circumstances of that case, the bankruptcy court rejected the excuse:

> The alleged reliance on these other individuals was not shown to be reasonable. Hart kept no trust records. Nothing in the evidence establishes any reasonable reliance on the "trustees" to keep records. In fact, none of the putative trustees were shown to have ever taken their role or responsibility seriously, and none effectively performed any services whatsoever. In "managing" the Property on a daily basis, Hart was aware of that vacuum.

> In short, the Court concludes Hart failed to credibly show a lack of sophistication, or a reliance on others, adequate to justify his failure to keep and preserve records.

563 B.R. at 39.

This case differs from *Hart*. Here, there is insufficient evidence at the summary judgment stage to conclude as a matter of law that the trustees of the Sheffield Crest Trust were trustees in name only; likewise, there is

insufficient evidence to determine whether the Pansiers' reliance on those trustees to keep adequate records is sufficient justification for their failure to do so.

The Court must note, however, that one of the Pansiers' purported justifications for the failure to produce adequate records is *not* sufficient: that the U.S. Trustee was obligated to fill in the gaps in the Pansiers' production by seeking documents from third parties. *See* ECF Doc. No. 63 at 20-21 ("The name and contact information of [the Pansiers'] Financial Planner and accountant, James Robert Berdan was also provided [in the Pansiers' initial disclosures]. . . . [I]f [the U.S. Trustee] wanted a clarification or more complete records, [he] had a duty to contact the Trustees, their Financial Planner and accountant in charge of these records and chose not to. . . . If the Plaintiff was dissatisfied with the Defendant's ability to provide them [sic] with answers, had technical questions regarding the fiduciary duties of trustees, tax returns or any other records they [sic] knew where to get them."). To the contrary, the U.S. Trustee was not required to seek documentation from third parties when the Pansiers had the obligation (and the ability) to request and produce those same records. *See, e.g.*, *Brown v. Ferrari (In re Ferrari)*, 587 B.R. 504, 514 (Bankr. N.D. Ill. 2018) ("The Court and creditors are not obligated to reconstruct the Debtor's financial situation and are not required to take his word for his financial affairs in the absence of adequate records. Nor does the Trustee need to issue subpoenas or otherwise search for records from third parties in order to recreate a picture of the Debtor's financial condition or support his incredible justification for failing to keep records.") (citing *Union Planters Bank*, *N.A. v. Connors*, 283 F.3d 896, 899 (7th Cir. 2002)); *Leibowitz v. Tanglis (In re Tanglis)*, 344 B.R. 563, 571 (Bankr. N.D. Ill. 2006) ("While [the debtor] may not possess her original credit card statements, she still had a duty and ability to retrieve them" under section 727(a)(3).).

In sum, while the records of the Sheffield Crest Trust are inadequate under section 727(a)(3), genuine issues of material fact remain as to whether

the Pansiers are responsible for that inadequacy, and if so, whether their failure to keep adequate records was justified.

## 2. Fly Slow Trust documents

The second basis of the U.S. Trustee's claim under section 727(a)(3) is that the Pansiers failed to produce adequate books and records concerning the nature of their transactions with the Fly Slow F.O. Living Trust—in particular, books or records explaining the disposition of nearly $8,400 in cash withdrawals by the Pansiers between January 2018 and the March 2018 petition date.

Like the Sheffield Crest Trust documents, the Fly Slow Trust documents are material to the debtors' financial condition. The debtors' social security income is deposited into the Fly Slow BMO Account and withdrawn to pay for the debtors' personal expenses. The debtors do not directly contest the materiality of the requested documents in their response (other than to make the general assertion that they have no interests in any of the STS entities). Rather, the debtors' main contention here is that the records they produced *are* sufficient: "The Defendants provided a detailed description explaining the disposition of the $8,400 in cash withdrawals between January 2018 and March 2018. *See* Defendant's [sic] Contested Fact §75." ECF Doc. No. 63 at 20, n.17. In Defendants' Contested Fact §75, they assert:

> The Defendants' monthly expenses from January, 2018 to March, 2018 according to their Schedules is $5,082.82, including the $2,000 paid for the Seventh Circuit Court of Appeals assessment, the $385.00 paid for the bankruptcy filing, and the $500.75 paid to Scioli & Associates, totaling $18,134.21. Because the IRS was seizing 100% of Mr. Pansier's pension income, the Defendants['] total income from January, 2018 through March, 2018 was $13,149.75. [FN 8] It is evident that the Defendants were insolvent and could not provide for their necessary living expenses while the IRS was levying over half their monthly income, and were left with no other option than to file bankruptcy.

> [FN 8] This amount includes the $3,000 withdrawal amount from the Defendant's Fidelity Investment Account in February, 2018.

ECF Doc. No. 64, at 30.

The U.S. Trustee replies that this unsubstantiated explanation is not credible or sufficient in light of the fact that the bank records for the Fly Slow Living Trust reflect total withdrawals of nearly $17,000 for that same period.

In this context, the debtors are more akin to the "ordinary debtor" described in *Tauber*, because the concern here is how the debtors spent the proceeds of withdrawals from the Fidelity and BMO accounts. When held to this lower standard of record-keeping, the Court cannot conclude as a matter of law that the debtors unjustifiably failed to maintain adequate records of their pre-petition cash expenditures such that it is impossible to ascertain their financial condition. While the Court may be able to conclude, after a trial and testimony from the debtors (including cross-examination by the U.S. Trustee), that the debtors' explanation of the use of the cash withdrawals is unsatisfactory or incredible, the Court cannot do so at this stage in the proceedings.[18]

For all these reasons, the U.S. Trustee's request for summary judgment on his cause of action under 11 U.S.C section 727(a)(3) will be denied.

## C.     Section 727(a)(4)(A): False Oaths

The Bankruptcy Code requires a full and complete disclosure by a debtor of interests of any kind. *In re Sgambati*, 584 B.R. at 874. Section 727(a)(4)(A) provides that the court shall grant the debtor a discharge, unless "the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account." 11 U.S.C § 727(a)(4)(A). To establish grounds for a denial of discharge under 727(a)(4)(A), the moving party must prove, by a preponderance of the evidence, that: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with intent to defraud; and (5) the statement related to the bankruptcy case in a material way. *Stamat v. Neary (In re Stamat),* 635 F.3d 974, 978 (7th Cir. 2011). The primary purpose of a "false oath" discharge

---

[18] Further testimony also would provide the debtors the opportunity to explain why the records of the Sheffield Crest Trust reflect a negative cash balance on several occasions.

exception is to "ensure that dependable information is supplied for those interested in the administration of the bankruptcy estate . . . without the need for the trustee or other interested parties to dig out the true facts in examinations or investigations." *Caldwell v. Powell (In re Powell)*, 580 B.R. 822, 836 (Bankr. E.D. Ark. 2018) (internal quotation marks omitted). "It is a debtor's role to carefully consider the questions posed and answer them accurately and completely." *Baccala Realty, Inc. v. Fink (In re Fink)*, 351 B.R. 511, 525 (Bankr. N.D. Ill. 2006). *See also In re Yonikus*, 974 F.2d 901, 904 (7th Cir. 1992) ("Debtors have an absolute duty to report whatever interests they hold in property, even if they believe their assets are worthless or are unavailable to the bankruptcy estate.").

The U.S. Trustee asserts that the debtors violated section 727(a)(4)(A) by (1) failing to disclose in their original schedules their interests in (a) four trusts and an LLC (Sheffield Crest Trust; Fly Slow F.O. CT, CL; Fly Slow F.O. Living Trust; Tuscany Trail, CT, CL; and Casey's Shadow LLC); (b) two bank accounts at BMO Harris Bank that the debtors use for their personal expenses and the funds held in those accounts; and (c) the UCC security interest the debtors granted in favor of the Tuscany Trail Trust; and (2) by further disclaiming any interest in these assets in amended schedules and during a Rule 2004 examination.

There is no question that the U.S. Trustee has established the first, second and fifth elements of his cause of action. As the Court already has concluded, the debtors held a beneficial interest in the Sheffield Crest Trust assets and in the STS entities and their assets at the time of filing their petition, which they failed to disclose in their initial filing or in their amended schedules. The debtors also failed to disclose the UCC security interest held by the Tuscany Trail Trust, as well as their unexpired lease (rental agreement) with the Sheffield Crest Trust, rental income received from Donna Pansier, and

the cash held at their residence on behalf of the Sheffield Crest Trust.[19] "Omissions from bankruptcy schedules and statement of financial affairs constitute a false oath for purposes of section 727(a)(4)(A)." *In re Sgambati*, 584 B.R. at 871. False testimony given during a section 341 creditors meeting or a Rule 2004 examination also constitutes a false statement. *Neugebauer v. Senese (In re Senese)*, 245 B.R. 565, 574 (Bankr. N.D. Ill. 2000); *John Deere Co. v. Broholm (In re Broholm)*, 310 B.R. 864, 880 (Bankr. N.D. Ill. 2004). Additionally, a statement is "material" if it "bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property." *Stamat,* 635 F.3d at 982 (internal quotation marks omitted).

So, the questions for the Court are whether the debtors knew their statements were false, and whether the statements were made with the intent to defraud. An intent to defraud "involves a material representation that you know to be false, or, what amounts to the same thing, an omission that you know will create an erroneous impression." *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998). Further, "not caring whether some representation is true or false—the state of mind known as 'reckless disregard'—is, at least for purposes of the provisions of the Bankruptcy Code governing discharge, the equivalent of knowing that the representation is false and material." *Id.*

---

[19] The debtors refused to state the amount of cash held by or on behalf of the Sheffield Crest Trust as of the petition date (*see* UST Ex. 12, at 13, Interrogatory No. 15), and instead referred the U.S. Trustee to the ledger the debtors provided. The Court therefore looks to the ledger for evidence of the amount of cash held by the trust as of the petition date. As previously noted, the Sheffield Crest Trust income/expense ledger is incomplete or inaccurate in several respects, one if which is that it does not include a starting balance for the cash on hand in January 2012. Assuming, however, that the balance on hand as of January 1, 2012 was at least $0 (because, according to the debtors, the trust uses the cash-basis method of accounting), and ignoring the many math errors in the ledger's tallies, the Court's own calculations indicate that the trust would have had a balance of over $2,000 in cash on hand as of March 18, 2018. (And if the Court were to rely on the "Total Balance" reported for the end of 2017, stated as $1,931.10, the number would be even higher; the trust's net income from January 1, 2018 through March 18, 2018, was $469.17, which results in cash on hand of over $2,400.) *See* UST Ex. 12, at 209–16. The debtors did not disclose that they were holding any property on behalf of another in their petition or amendments.

To establish an intent to defraud, "[t]he plaintiff must prove the omissions are the fruit of an intent to deceive, or form a pattern of reckless indifference to the truth." *In re Sgambati*, 584 B.R. at 871. "A debtor's honest confusion or lack of understanding may weigh against a finding of fraudulent intent." *Id.* "Not every single asset needs to be scheduled and valued, but there is a point at which the cumulative errors and omissions cross a line and a debtor's discharge should be denied." *Id.* (citing *Netherton v. Baker (In re Baker)*, 205 B.R. 125, 133 (Bankr. N.D. Ill. 1997)).

The debtors assert that it is not appropriate for the Court to determine whether they acted with the requisite fraudulent intent at the summary judgment stage, citing *Rieser v. Hayslip (In re Canyon Sys. Corp.),* 343 B.R. 615, 636 (Bankr. S. D. Ohio 2006) and *1st Farm Credit Services, PCA v. Phillips (In re Phillips)*, No. 05-87521, 2007 WL 1297011 (Bankr. C.D. Ill. May 1, 2007). While it is true that fraudulent intent is a question of fact rarely suitable for determination on summary judgment, in certain situations summary judgment on a fraud claim may be appropriate:

> A denial of knowledge may be so utterly implausible in light of conceded or irrefutable evidence that no rational person could believe it; and if so, there is no occasion to submit the issue of knowledge to determination at a trial. . . .
>
> . . . [C]redibility issues are to be left to the trier of fact to resolve on the basis of oral testimony *except* in extreme cases. The exceptional category is—exceptional. For the case to be classified as extreme, the testimony sought to be withheld from the trier of fact must be not just implausible, but utterly implausible in light of all relevant circumstances.

*In re Chavin*, 150 F.3d at 728.

In the twenty years since the Seventh Circuit provided this guidance, courts within the Circuit have, on occasion, decided issues of intent at the summary judgment stage. *See, e.g., In re Peterson*, 604 B.R. at 764–66; *In re Holstein*, 299 B.R. at 233; *Rogers v. Boba (In re Boba)*, 280 B.R. 430, 435 (Bankr. N.D. Ill. 2002).

According to the U.S. Trustee, the debtors' case is the exceptional case where the undisputed evidence is so clear and the countervailing explanations so preposterous that the Court can reach no other conclusion than that the

debtors acted knowingly and with intent.  In support of this assertion, the U.S. Trustee points to the following undisputed facts:

- The debtors are educated individuals who, over the course of decades, have represented themselves in federal bankruptcy, district, and appellate courts.  Mrs. Pansier, who holds a law degree, has taken up the heavy oar of making complex oral arguments and drafting pleadings.

- In 2012, the debtors entered into a "specialized trust strategy" for the purpose of giving up ownership, but retaining control, of their assets.

- The debtors did not disclose the existence of this scheme when they filed for bankruptcy; specifically, their initial petition did not disclose:

  o Four trusts: Sheffield Crest Trust; Fly Slow F.O., CT, CL; Fly Slow F.O. Living Trust, and Tuscany Trail, CT, CL;

  o Casey's Shadow LLC;

  o Two bank accounts held at BMO Harris Bank used for personal expenses, or the funds held within those accounts; and

  o A UCC security interest the debtors granted in favor of Tuscany Trail Trust.

- After the United States Trustee requested a Rule 2004 examination to inquire into the debtors' undisclosed trusts, the debtors filed an amended schedule A/B on July 26, 2018.

- Although the amended schedule revealed the existence of the Fly Slow F.O. Living Trust, the Sheffield Crest Trust and the Tuscany Trail Trust, the debtors used the amendment to further disavow their interests in these entities by stating: "No rights or powers exercisable for our personal benefit.  Therefore, the trusts do not constitute a financial asset."

- Just two days before filing the amendment, the debtors made withdrawals from the Fly Slow F.O. Living Trust BMO Account, an account on which they are named as trustees and signatories, to pay their personal Barclay credit card bill in the amount of $267.88.

- The amended schedule A/B also was not complete; for example, it did not disclose a fourth trust—Fly Slow F.O., CT, CL—or Casey's Shadow LLC and its bank account.

- In addition, the debtors never amended Schedule G to list their rental agreement with Sheffield Crest Trust, nor did they amend their SOFA to

reflect their 2012 transfers to the STS entities or the cash held at their residence on behalf of the Sheffield Crest Trust.

At a minimum, says the U.S. Trustee, the myriad false statements and omissions within the debtors' schedules and their testimony at the meeting of creditors—in light of their inaccurate and incomplete amendments to their schedules—demonstrate their reckless indifference to the truth.

The Pansiers disagree, pointing to their amended schedules not as further evidence of fraud, but instead as "manifestly indicative of their good faith and full disclosure." According to the Pansiers, they not only showed themselves to be honest debtors in their amendments, but they went "'overboard' in making full and complete disclosures of every aspect of the trusts and the LLC."

What the Pansiers fail to address, however, is the U.S. Trustee's argument that their amendments, which were made only after the U.S. Trustee began raising questions about their assets and moved for a Rule 2004 examination, were not made of the debtors' own accord, citing *In re Fink,* 351 B.R. at, 526–27 (the fact that the debtor made amendments to his schedules only after a creditor filed a complaint seeking denial of discharge "demonstrates that full and honest disclosure was not important to this Debtor"). Nor were the debtors' additional disclosures complete.

In light of the undisputed facts, the Court cannot view the debtors' amendments to their schedules as voluntary or as signs of good faith. There is no basis for a reasonable fact-finder to conclude that the debtors would have amended their schedules absent further inquiry by the U.S. Trustee. Moreover, the amendments did not serve as additional disclosure of assets; to the contrary, the debtors used the amendments to disclaim further their interests in the trusts and other assets, and even then only made a partial disclosure (continuing to omit the Fly Slow F.O. CT, CL, Casey's Shadow and its BMO bank account, their lease agreement, income from Donna Pansier, etc.).

As a secondary argument, the debtors rely on their prior bankruptcies (and, implicitly, prior bankruptcy counsel), asserting: "As far as the

Defendants['] course of conduct and surrounding circumstances, the fact that they did not initially disclose the existence of trusts was due to the fact that they were not required to do so in their previous bankruptcies." This argument is flawed for a couple of reasons. First, the debtors entered into the STS program—and created the majority of the trusts and the LLC at issue—nearly four years after the 2008 bankruptcy petition. Second, even if the debtors received ineffective assistance of counsel in their prior bankruptcy case (or took bad advice from their financial planners), that is no defense to a charge of reckless indifference to the truth. *See Warsco v. Saylor (In re Saylor)*, 339 B.R. 190, 193 (Bankr. N.D. Ind. 2006) ("The debtors chose their legal representative and, for better or for worse, must accept the consequences of that choice. If their attorney truly is to blame for the falsehoods in the schedules and statement of affairs, allowing that to change the outcome of this litigation is not the proper response.") (internal citations omitted).

Nor can the debtors defend their falsehoods by claiming that they did not understand the questions being asked of them. *See id.* (The debtors "both testified that they do not know what a transfer is and so did not understand the questions put to them either in connection with completing the statement of affairs or at the meeting of creditors, and this is why their response is not correct. In other words, the debtors did not know what was being asked of them, knew they did not know and, yet, answered anyway—without disclosing their lack of understanding or asking for any type of clarification or explanation. An answer given under these circumstances is a classic example of 'not caring whether some representation is true or false . . . .'") (quoting *Chavin,* 150 F.3d at 728). For example, the Pansiers' testimony at the Rule 2004 examination suggests that they either did not understand the meaning of "self-settled trust," *see* UST Ex. 3, at 94:2-95:4, or did not consider themselves beneficiaries of the STS trusts, *see id.* at 99:1-21, which is why they failed to disclose those entities on their petition. As the Court has concluded above, the debtors are, in fact, beneficiaries of the STS trusts and their asserted belief to

the contrary in light of the plain language of the trust documents is unreasonable. And given that the SOFA specifically refers to self-settled trusts as "asset-protection devices"—which is how the Pansiers describe the STS entities—the Pansiers' failure to inquire further into their disclosure responsibilities and the meaning of "self-settled trust" demonstrates a reckless indifference to the truth. While "honest confusion" or "honest lack of understanding" may weigh against a finding of fraudulent intent, *see In re Hatton*, 204 B.R. at 484, that is not the operating animus here.

The debtors' approach to disclosure in this case (exemplified by the ever-changing stories they've told about the transfer and ownership of equity in the Crivitz Property) reflects a cavalier attitude toward the truth. Their numerous omissions and inconsistent statements—even when viewing the facts in the light most favorable to the debtors—make their assertion of lack of knowledge or fraudulent intent utterly implausible in light of all relevant circumstances. Like the debtor in *Chavin*, the Pansiers have provided incredible and unbelievable explanations for their failure to completely and accurate disclose their assets in this case. No reasonable factfinder could conclude that the debtors did not, at a minimum, act in reckless disregard for the truth of their statements, and therefore made the statements with the requisite intent to defraud.

For these reasons, the U.S. Trustee has met his burden of proving that he is entitled to judgment as a matter of law on his cause of action under 11 U.S.C. section 727(a)(4)(A).

### D. Section 727(a)(5): Failure to Explain a Loss or Diminution of Assets

Section 727(a)(5) provides that "[t]he court shall grant the debtor a discharge, unless . . . the debtor has failed to explain satisfactorily . . . any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5). Under this section, a court has "broad power to decline to grant a discharge in bankruptcy where the debtor does not adequately explain a

shortage, loss, or disappearance of assets." *First Federated Life Insurance Co. v. Martin (In re Martin)*, 698 F.2d 883, 886 (7th Cir. 1983).

There are two stages of proof with respect to § 727(a)(5):

First, the party objecting to discharge has the burden of proving [by a preponderance of the evidence] that debtor at one time "owned substantial and identifiable assets that are no longer available to his creditors." . . . Second, if the party objecting to the discharge meets its burden, then the debtor "is obligated to provide a satisfactory explanation for the loss."

*Banner Oil Co. v. Bryson (In re Bryson),* 187 B.R. 939, 955 (Bankr. N.D. Ill. 1995).

What constitutes a "satisfactory" explanation for § 727(a)(5) purposes is left to the discretion of the Court. *Baum v. Earl Millikin, Inc.,* 359 F.2d 811, 814 (7th Cir. 1966). Although the explanation need not be comprehensive, it must meet two criteria to be deemed "satisfactory." *In re Bryson*, 187 B.R. at 956. First, it must be "good enough to eliminate the need for the Court to speculate as to what happened to all the assets." *Id.* Second, it must be supported by some documentation (documentation "sufficient . . . to free the Court from the need to speculate about the veracity of the debtor's explanations"). *Id.* In other words, the debtor's explanation "must consist of more than . . . vague, indefinite, and uncorroborated" assertions. *Baum*, 359 F.2d at 814. Instead, "it must be a good faith explanation of what really happened to the assets in question." *Olson v. Potter (In re Potter),* 88 B.R. 843, 849 (Bankr. N.D. Ill. 1988). A debtor "cannot abuse the bankruptcy process by obfuscating the true nature of his affairs and then refusing to provide a credible explanation." *In re Martin*, 698 F.2d at 888.

The U.S. Trustee alleges that the Pansiers failed to satisfactorily explain the loss of (a) the equity in Crivitz Property; and (b) cash.

## 1. **Equity in the Crivitz Property**

According to the U.S. Trustee, the debtors violated section 727(a)(5) by providing unsatisfactory and conflicting documentation regarding the ownership of the unencumbered $343,500 Crivitz Property.

The debtors do not dispute that, in 2012, the Sheffield Crest Trust transferred the equity in the Crivitz Property to the Fly Slow F.O., CT, CL—of which the debtors were both trustees and certificate holders at the time of transfer and up through the petition date. The record further establishes the following material facts:

- In August 2017, the debtors caused a UCC financing statement to be filed with the Wisconsin Department of Financial Institutions, pledging "all present and future equity in" the Crivitz Property to the Tuscany Trail Trust.

- In November 2017, the debtors informed the IRS that Casey's Shadow LLC "holds the asset consisting of real property located at [the Crivitz Property]" and provided the IRS with copies of, among other things, Schedule B-1 of the Fly Slow Trust documents, documenting the 2012 equity transfer.

- In March 2018, shortly before filing their bankruptcy petition, the debtors relayed the contents of their November correspondence with the IRS to the district court, asserting that the documents they provided to the IRS "establish that Sheffield Crest Trust is not a 'fiduciary or transferee'" under the Internal Revenue Code.

- The debtors did not disclose any interest in the Crivitz Property on their schedules.

- In their answer to the U.S. Trustee's complaint, the debtors answered paragraph 93 as follows: "The Defendants admit that Exhibit B shows that Schedule B-1 to the [Fly Slow] trust states that the Sheffield Crest trust by Trustee Gary J. Simon transferred the equity in the Crivitz Property to the Fly Slow trust as of April 2012; however, this was an inadvertent error due to the fact that Sheffield Crest Trust is an irrevocable trust and the FLY SLOW F.O., CT, CL, MINUTE ORDER NO. 10 shows that the original Schedule B-1 was rescinded on May 29, 2012."

- The debtors did not file a copy of the Fly Slow F.O., CT, CL, Minute Order No. 10 with their answer to the complaint, and there are no documents in the record that match the description of the minute order in question reflecting a May 29, 2012 rescission of the equity transfer.

Based on these facts, the U.S. Trustee has made out a *prima facie* case that the debtors, through the STS entities, owned substantial assets (the equity

in the Crivitz Property), which the debtors claimed the STS entities controlled as late as November 2017, but now assert are no longer available to their creditors.

In their response brief, the Pansiers attempt to explain this loss of assets as follows:

> The Defendants admit to the confusion surrounding the fact that they made representations to the IRS in 2017 that in 2012 the equity was transferred to the FLY SLOW TRUST, F.O. CT, CL. This was the procedure in the financial planning program, Master's Protection Group, LLC (STS) the Defendants joined in 2012 in order to add an additional layer of protection in the case of an unexpected automobile accident, identity theft, death/probate, or nursing home spend down. After Michael Clark, the Representative Financial Planner passed away on June 18, 2017 and William F. Tully of Tully Tax and Accounting took over, the Defendants were advised to rescind the original Fly Slow, F.O. CT, CL Schedule B-1: Real Property Equity Transfer which they did on December 16, 2017 because the legal title to the property and the warrant deed were in the name of Sheffield Crest Trust, *See* Exhibit III-A, B.

ECF Doc. No. 63, at 27-28. The debtors attach as Exhibit III-A a document titled Fly Slow F.O. CT, CL Minute No. 13, which purportedly evidences a December 16, 2017 meeting in which the original Schedule B-1 property transfer was rescinded. *See id.* at 46.

In reply, the U.S. Trustee points out that (1) the debtors produced this new trust document only after the U.S. Trustee asserted in his summary judgment motion that the debtors had failed to provide any evidence of a property transfer rescission (and the debtors offer no explanation for why this record was not produced pursuant to the U.S. Trustee's discovery requests); (2) the debtors fail to explain why this new document conflicts with the representation in their answer to the complaint that the transfer was rescinded in 2012; and (3) the debtors do not explain the pending UCC financing statement with the Wisconsin Department of Revenue pledging "all present and future equity in" the Crivitz Property to "Tuscany Trail."

The explanations offered by the debtors, including their documentary evidence, are disputed. The Court is unable to make the appropriate credibility

determination and evidentiary assessment as a matter of law. Other courts have concluded that where debtors face a potential denial of discharge based on loss of assets, they should be given the opportunity to present evidence to explain that asset loss. *See, e.g.*, *Taylor v. Lineberry (In re Lineberry)*, 55 B.R. 510, 513 (Bankr. W.D. Ky. 1985) ("The standard by which explanation of loss or deficiency of assets to meet liabilities is measured is one of reasonableness or credibility."); *see also Fed. Deposit Ins. Corp. v. Hendren (In re Hendren)*, 51 B.R. 781, 789 (Bankr. E.D. Tenn. 1985) ("The debtor's explanation fails in the instant case to meet that [reasonableness/credibility] test. In so concluding, this court has been guided first by basic considerations of credibility. The court notes that the debtor's testimony in other areas evidenced some substantial and disturbing inconsistencies. A determination of credibility involves not simply an assessment of whether the court is dealing with willful, flagrant falsehood but also an assessment of whether the court has been provided acceptably accurate information bearing some reasonable relationship to actual fact. In short, the court must have . . . some sense that it is dealing with more than an unreliable remake of reality, custom-made to comport with current exigencies."). The Court will not deny discharge on summary judgment based on the debtors' inability to explain (or adequately trace) the loss of equity in the Crivitz Property.

### 2. Cash

The U.S. Trustee also alleges that the debtors violated section 727(a)(5) by failing to explain the loss of cash held on behalf of the Sheffield Crest Trust, as well as cash withdrawn from the Fly Slow Living Trust bank account shortly before filing for bankruptcy.

Regarding the cash held on behalf of the Sheffield Crest Trust, the U.S. Trustee points to the debtors' claim that they pay $1,275 per month in cash as a rental payment to the Sheffield Crest Trust, cash which they keep at the Crivitz Property. Yet the debtors did not disclose any cash on hand or cash held for another as of the petition date within their schedules. And the debtors also refuse to state the amount of cash or cash equivalents held on behalf of

that trust as of the petition date. The Court's calculations based on the available evidence—the trust ledger provided by the debtors—result in at least $2,000 in cash held on behalf of the trust as of the petition date, see *supra* note 19.

As for the cash withdrawn from the living trust account, the U.S. Trustee points out that the debtors withdrew $8,400 in cash from Fly Slow F.O. Living Trust's undisclosed bank account within three months of the petition date, but have not satisfactorily explained the disposition of these prepetition cash withdrawals.

The debtors do not directly refute the U.S. Trustee's allegations about the missing cash in their response brief. Instead, they use their response to the U.S. Trustee's statement of fact number 75 to address the U.S. Trustee's claims—and even then, only those concerning the Fly Slow Living Trust account withdrawals:

> The Defendants' monthly expenses from January, 2018 to March, 2018 according to their Schedules is $5,082.82, including the $2,000 paid for the Seventh Circuit Court of Appeals assessment, the $385.00 paid for the bankruptcy filing, and the $500.75 paid to Scioli & Associates, totaling $18,134.21. Because the IRS was seizing 100% of Mr. Pansier's pension income, the Defendants['] total income from January, 2018 through March, 2018 was $13,149.75. [FN 8]
>
> [FN 8] This amount includes the $3,000 withdrawal amount from the Defendant's Fidelity Investment Account in February, 2018.

ECF Doc. No. 64, at 30.

As noted in section B.2 *supra*, the U.S. Trustee argues that this unsubstantiated explanation is not credible given that the bank records for the Fly Slow Living Trust reflect total withdrawals of nearly $17,000 for that same period, including expenses for telephone and credit card payments. According to the U.S. Trustee, the debtors have provided nothing more than a "vague, indefinite, and uncorroborated hodgepodge" of documents that fails to explain the disposition of their assets and beneficial interests, and so warrants a denial of the debtors' discharge as a matter of law under 11 U.S.C. § 727(a)(5).

While the debtors' documents produced to date may be incomplete and disorganized, the overall context appears to be, at this summary judgment stage, unaccounted for expenditures for non-exorbitant living expenses. Caselaw adopting this contextual view persuades the Court that, like the disputed evidence as to channeling of the equity in the Crivitz Property, the debtors should not be denied discharge on summary judgment based on their failure to explain loss of cash. *See, e.g.*, *In re Hale*, 274 F. Supp. 813, 816 (D.C. Va. 1967) (debtors who have never had substantial assets should not be denied a discharge under this subsection; when debtor's wages were no more than enough to cover reasonable living expenses for himself and his family, lack of great detail in accounting for his wages was not sufficient grounds to deny a discharge); *Prentiss v. Gagnon (In re Gagnon)*, 40 B.R. 951, 952–53 (Bankr. D. Me. 1984) ("Although the debtor's explanation of the loss of her assets 'must consist of more than . . . [a] vague, indefinite, and uncorroborated hodgepodge of financial transactions,' it need not explain in detail every dollar spent on living expenses.  Here, the debtor accounted with specificity for almost $15,000 of the approximately $18,300 in question.  It appears that the remaining $3000–$3500 was spent on living expenses over at least an 18-month period for the debtor, her elderly father, sister and brother.  The Court is not persuaded that the debtor has failed to explain satisfactorily what happened to the $18,300 in question.") (internal citations omitted); *but see Sonders v. Mezvinsky (In re Mezvinsky)*, 265 B.R. 681, 696–97 (Bankr. E.D. Pa. 2001) ("The burden of production now shifts to the Debtor to provide a satisfactory explanation as to the loss of or deficiency in the Personal Loan Assets. The Debtor's testimony is that, 'to the best of [her] recollection,' $27,500 was used for general living expenses. General and vague assertions that money was spent on living expenses, however, are insufficient under § 727(a)(5) absent documentary corroboration.  Here, the Debtor has failed to present *any* corroboration to support her assertion that $27,500 was used for living expenses. Moreover, even given my discretion to assume a portion of the

Personal Loan Assets was applied to living expenses, I will not do so here given that the disposition of the overwhelming bulk of $1.4 million remains shrouded in mystery.") (internal citations omitted).

Because material issues of fact remain as to the sufficiency and credibility of the debtors' explanation for the loss of cash, the Court will not deny their discharges under section 727(a)(5) on summary judgment.

## CONCLUSION

Whether the Pansiers received bad advice from financial planners in 1985 and 2012 and beyond matters little in terms of Counts I and III of the adversary complaint. The Pansiers lived in the Crivitz Property before and after they filed this bankruptcy case, and knowingly did not disclose their true interest in it, in 2018. They knowingly did not disclose their true interest in all of the personal property and income they transferred to the maze of trust and LLC entities they established until the eve of their Rule 2004 examinations and related document production requests. No reasonable factfinder could conclude otherwise, based on the undisputed facts presented.

The U.S. Trustee therefore is granted summary judgment on Counts I and III of the complaint, and debtors Gary and Joan Pansier will be denied a discharge under 11 U.S.C. §§ 727(a)(2) and (a)(4)(A). A separate order will be entered consistent with this decision.

Dated: January 17, 2020

By the Court:

Beth E. Hanan
United States Bankruptcy Judge